CLERK'S OFFICE U.S. DISTRICT. COURT
AT ROANOKE, VA
FILED

_Cullen_
District Judge
Assign. by Clerk's Ofc.

IN THE UNITED STATES DISTRICT COURT

for the WESTERN DISTRICT OF VIRGINIA

JAN 27 2023

LAURA A. AUSTIN, CLERK
BY: _____
DEPUTY CLERK

_Ballou_
Mag. Referral Judge
Assign. by Clerk's Ofc.

For use by Inmates filing a Complaint under

**CIVIL RIGHTS ACT, 42 U.S.C. §1983 or <u>BIVENS v. SIX UNKNOWN NAMED AGENTS
OF FED. BUREAU OF NARCOTICS, 403 U.S.C. §388 (1971)</u>**

Marcos F. Santiago
Plaintiff full name

55363-066
Inmate No.

v.

CIVIL ACTION NO. 7:23·Cv· 00064
(Assigned by Clerk's Office)

Warden Streeval, et al
Defendant(s) full name(s)

*****************************************************************

A. <u>**Where are you now?**</u> Name **_and_** address of facility   USP Lee, PO Box
305, Jonesville, VA 24263

B. Where did this action take place?   USP Lee

C. Have you begun an action in state or federal court dealing with the same
facts involved in this complaint?

_____ Yes        ✓ No

If your answer to A is Yes, answer the following:

1. Court: _____

2. Case Number: _____

D. Have you filed any grievances regarding the facts of this complaint?

✓ Yes        _____ No

1. If your answer is Yes, indicate the result:

Denied
_____

_____

2. If your answer is No, indicate why:

E. Statement of Claim(s): State briefly the facts in this complaint. Describe what action(s) each defendant took in violation of your federal rights and include the relevant dates and places. **Do not give any legal arguments or cite any cases or statutes.** If necessary, you may attach additional page(s). Please write legibly.

Claim #1 – Supporting Facts – Briefly tell your story without citing cases or law:

Extra-Judicial acts of Retaliation.
(See Memorandum of facts in Support
of Plaintiffs Bivens Action)

Claim #2 – Supporting Facts – Briefly tell your story without citing cases or law:

F. State what relief you seek from the Court. Make no legal arguments and cite no cases or statutes.

Immediate Termination of Employment of various USP Lee

G. If this case goes to trial, do you request a trial by jury?   Yes ✓   No _____ The Staff &
their arrest &
H. If I am released or transferred, I understand it is my responsibility to immediately Monetary
notify the court in writing of any change of address after I have been released or damages
transferred or my case may be dismissed.

SIGNATURE: _____   Date June 6, 2022

VERIFICATION:
I, Maureos Santiago _____, state that I am the plaintiff in this action, and I know the content of the above complaint; that it is true of my own knowledge, except as to those matters that are stated to be based on information and belief, and as to those matters, I believe them to be true. I further state that I believe the factual assertations are sufficient to support a claim of violation of constitutional rights. Further, I verify that I am aware of the provisions set forth in 28 U.S.C. §1915 that prohibit an inmate from filing a civil action or appeal, if the prisoner has, on three or more occasions, while incarcerated brought an action or appeal in federal court that is dismissed on the grounds that it was frivolous, malicious, or failed to state a claim upon which relief may be granted, unless the prisoner is imminent danger of serious physical injury. I understand that if this complaint is dismissed on any of the above grounds, I may be prohibited from filing any future actions without the pre-payment of the filing fees. I declare under penalty of perjury the foregoing to be true and correct.

SIGNATURE: _____   Date: June 6, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

MARCOS F. SANTIAGO
         Plaintiff

v.

USP LEE WARDEN J.C. STREEVAL
USP LEE TRUST FUND SUPERVISOR DYE
USP LEE COUNSELOR CALTON
USP LEE CASE MANAGER SEXTON
USP LEE UNIT OFFICER T. HALL
USP LEE SIS T. HOUSE
USP LEE MAILROOM DEPARTMENT
USP LEE CHIEF PSYCHOLOGIST
USP LEE LT. VINZANT
USP LEE LT. HAMILTON
USP LEE LT. P. CORBIN
USP LEE OFFICER EWING
USP LEE OFFICER DICKENSON
USP LEE OFFICER BRADBURN
USP LEE OFFICER GILMER
USP LEE OFFICER HAMILTON
USP LEE MEDICAL P.A. BRAY
USP LEE MEDICAL P.A./NURSE PAULEY, MARYELLEN

$:Ves 7020 0640 0000 9500 3844

CAPTAIN BOWLES
USP LEE OFFICER WELCH
USP LEE OFFICER WILSON
         Defendants.

Case No._____

## SUMMARY OF PLAINTIFF'S CASE

Pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of
Narcotics, Plaintiff, Marcos F. Santiago, pro se, sues the above-named
derfendants for violating multiple constitutional rights held by Plaintiff, the
latest of which occurred as recently as June 7, 2022, when Plaintiff was
physically attacked in the lieutenant's office of USP Lee by Lt. Vinzant, officer
J. Roberts, and others, and then, based on falsified incident reports issued by
Lt. Vinzant and officer J. Roberts against Plaintiff, tortured for roughly 18
hours in the Special Housing Unit (SHU) with and while in four point restraints
and ambulatory restraints, by Lt. Hamilton, Lt. P. Corbin, officer Bradburn,
officer Ewing, officer Dickenson, officer Gilmer, officer Hamilton, and others,
who slammed shields on Plaintiff, punched Plaintiff multiple times in his
testicles, jabbed a shield into Plaintiff's ribs causing Plaintiff to suffer a
fractured rib (for which evidence exists in the form of an X-ray examination),

i

chained Plaintiff in a torturous manner while he was in four-point restraints
(i.e., with his right arm and leg chained to the left side of the concrete bunk
and his left arm and leg chained to the right side of the concrete bunk);
moved the restraints on Plaintiff in an erratic manner to cause Plaintiff to
experience excruciating pain and scarring on his ankles; smashing and grinding
the bottoms of his feet while he was on his knees during the ambulatory restraint
phase, and pressing the bottom of the shield down into the back of his legs, where
the legs fold to cause Plaintiff to experience excruciating pain in both his
knees and feet; denied Plaintiff medical attention and filled out falsified
inmate injury reports after Plaintiff was forced to say on camera that he did not
have any injuries; threatened Plaintiff with further violence if he did not give
up his Tort Claim lawsuit and stop filing grievances; cancelled Plaintiff's
$505.00 money made out to the clerk of court as he was being tortured, presumably
under the assumption that Plaintiff would be transferred to another institution;
trashed Plaintiff's boots he recently purchased, and other things.

For a full account of the above events, and how everything got started, see
Exhibit R attached hereto, consisting of a 13-page letter with exhibits that
Plaintiff wrote to his Jones Day attorney, Zaki Anwar, Esq., shortly after his
release from the SHU on July 28, 2022, in which he elaborated on the abuse and
torture that not only he was subjected to, but also witnessed other inmates being
subjected to during his nearly two-month stay in the SHU by the defendants and
other USP Lee officers, including even Captain Bowles.

Plaintiff will describe the details concerning the events of June 7, 2022
towards the end of his complaint, but first he wishes to demonstrate that what
happened to him on June 7, 2022 was merely the latest and most extreme form of
retaliation of a series of retaliatory acts and other extrajudicial acts

ii

directed at Plaintiff by the defendants, that took place for nearly a year before June 7, 2022, so that Plaintiff may make it clear that what he suffered on June 7, 2022, was no spontaneous series of events, but something that had been planned by the defendants who had been plotting to cause Plaintiff harm for quite some time. Proceeding chronologically, Plaintiff thus begins with Defendant Trust Fund Supervisor, Mrs. Dye.

One last word before Plaintiff proceeds. To better help the Court understand the somewhat confusing structure of this document, particularly the updates on pages 49 and 55, Plaintiff clarifies that the original version of this document ended at page 49; but, because Plaintiff continued to experience harrassment and acts of retaliation by various USP Lee officers even while he was in the process of preparing this document and exhausting his administrative remedies, he found it necessary to amend the original version of this complaint by changing the closing page into an update and closing at page 55. Because Plaintiff was attacked and tortured on June 7, 2022, however, he again found it necessary to amend this complaint by extending page 55 with second update, in which he elaborated on the details concerning the defendants' most serious violations of Plaintiff's constitutional rights on June 7, 2022.

Though somewhat confusing, Plaintiff has decided to leave his complaint as it is, since it supports his claim that the defendants were involved in a months-long conspiracy to cause harm to Plaintiff. For example, in the first update (pp. 49-55) of this complaint, Plaintiff merely named Lt. P. Corbin as a potential defendant. In the second update, however, after Lt. P. Corbin participated with other defendants in abusing and torturing Plaintiff on June 7, 2022, among other things, Plaintiff has named him as a defendant. These updates make it clear that Plaintiff's pre-June 7, 2022 claims of a conspiracy being cooked up against him by multiple USP Lee officers, were not just the product of

an imagination-gone-wild, but rather were the product of a sound and sharp mind that correctly perceived the defendants' plot against him through their many reckless extra-judicial and retaliatory acts against Plaintiff, which they engaged in seemingly without much concern for covering up their tracks, since they had been getting away with abusing inmates for years now without having to account for their actions.[*] With that, Plaintiff now proceeds with his complaint, chronologically, starting with USP Lee's Trust Fund Supervisor, Mrs. Dye.

Marcos F. Fintroso

---

[*] As the docket in Marcos F. Santiago v. United States of America, 7:21-cv-00436-JPJ-PMS (W.D.Vir. 2021), docket number 54 (filed on March 7, 2022) makes clear, Plaintiff didn't just wait till after he was attacked on June 7, 2022 to mention Lt. P. Corbin as a defendant, but mention him as a potential defendant prior to June 7, 2022 -- i.e., roughly three months before Lt. P. Corbin participated in Plaintiff's torture. Plaintiff filed document 54, consisting of this complaint with the first update with a request for the FBI to open up an investigation against the defendants for their crimes, in which he named Lt. P. Corbin as a potential defendant. (See pages 52-55 of document 54 of the above-identified case docket.)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

MARCOS F. SANTIAGO,
                    Plaintiff

v.

| | |
|---|---|
| USP LEE WARDEN J.C. STREEVAL | USP LEE OFFICER GILMER |
| USP LEE COUNSELOR CALTON | USP LEE OFFICER HAMILTON |
| USP LEE TRUST SUPERVISOR DYE | USP LEE MEDICAL P.A. BRAY |
| USP LEE CASE MANAGER SEXTON | USP LEE MEDICAL P.A./NURSE |
| USP LEE UNIT OFFICER T. HALL | POLLOCK (name may be |
| USP LEE SIS T. HOUSE | mispelled) |
| USP LEE MAILROOM DEPARTMENT | USP LEE OFFICER WELCH |
| USP LEE CHIEF PSYCHOLOGIST | USP LEE OFFICER WILSON |
| USP LEE LT. VINZANT | USP LEE CAPTAIN BOWLES |
| USP LEE LT. HAMILTON | |
| USP LEE LT. P. CORBIN | |
| USP LEE OFFICER EWING | |
| USP LEE OFFICER DICKENSON | |
| USP LEE OFFICER BRADBURN | |

MEMORANDUM OF FACTS IN SUPPORT OF PLAINTIFF'S BIVENS ACTION

Pursuant to Bivens v. Six Unknown Named Agents of Federal
Bureau of Narcotics, 403 U.S. 388 (1971)(authorizing individuals
to sue federal officers for violations of constitutional
rights), Plaintiff presents the following facts against the
defendants.

DEFENDANT DYE (Trust Fund Supervisor)

     (a) Not long after Plaintiff entered into USP Lee in
October of 2020, he began having problems with Trust Fund
Supervisor, Mrs. Dye (Dye). Plaintiff had previously raised a
Rehaif issue via §2241 petition in a District Court in Illinois
while he was housed at AUSP Thomson, Illinois; and when the
court, judge Reinhard, denied Plaintiff's Rehaif claim, Plaintiff

1

was required by the Court to provide it with a certified
statement of his inmate trust fund account for the preceding six
months in order to appeal informa pauperis. When Plaintiff, who
was then in the Special Housing Unit of USP Lee (SHU) for
quarantine purposes, saw Dye as she made her rounds in the SHU,
he handed her a request for said document. But when Plaintiff
saw her again a few days later and asked her for the document in
question, she responded by saying:

> "I don't give those directly to inmates in the SHU. I give
> them to the SHU Lieutenant, and you can ask him for it."

When Plaintiff saw SHU Lt. Nichols not long thereafter, however,
and asked him for the document in question, he told Plaintiff
that he couldn't find it and suggested that Plaintiff ask Mrs.
Dye for another one. Specifically, he said that he had a stack
of papers on his desk that he meant to hand out to various
inmates, but that someone removed them and that he can't find
them. "So, you might want to ask Dye for it again," he
concluded.

To make a long story short, even after Plaintiff's 21 days
of quarantine were up and he was released out into general
population, Dye still gave Plaintiff an incredibly difficult
time obtaining the document that he was required to provide to
the District Court of Illinois. Months went by and Plaintiff was
forced to motion the Court for several extensions of time
because of Dye's adamant and conscious refusal to provide
Plaintiff with the document required by the Court. For proof of
this Plaintiff humbly asks this Honorable Court to review the
docket in the District Court of Illinois, in the case: Marcos F.

2

Lastly, in Letter Log the court under[...] the structure of the "document" particularly the updates on pp. 47 & 55, [...] p. [...] clarifies that the original version of the document ended at p. 49, but because p. [...] continued to experience harassment by various Officers even [...] while he was in the process of preparing the document & exhausting his administrative remedies he found it necessary to amend the original version by [...] changing [...] close page into an update, [...] on which he ended at p. 55. And then, after p. was attacked on June 7, 2022 & was released from this SHU on July 28, 2022, he found it necessary to once again amend the following document by changing the close p. (pp. pp. 55) into a second update on which he elaborates on the events of June 7, 2022 & on what exactly [...]. As [...] was in p. [...] (short [...] nature [...]. [...] somewhat confusing, the [...] p. has decided to leave the [...] in complaint in its essence to support his claim of a conspiracy to cause p. harm. For example, in the first update [...] merely named but p. infers as a potential def. In his second update, however, given [...] p. Corbin [...] with [...] plaintiff [...] assaults, to abuses, & torture, p. on June 7, 2022 [...] p. has now [...] make it clear that p. [...] pre-June 7 2022 claims were of a conspiracy that ended up against him by multiple [...] were not just the product of imagination gone wild, but rather the accurate recording [...] multiple [...], but rather were [...] the [...] recording of a sound mind that [...] p. [...] defs. that against him through the [...] (correctly) [...] these extra judicial [...] manifestation of [...] courtly [...] retaliatory [...] as against him. With that p. now proceeds with the complaint chronologically. [...] with US, Less Trust Fund Supervisor, Mrs. DYE.

Santiago, 3:19-cv-50273, which reflects the fact that, after the Court granted several extensions of time to Plaintiff, the District Court finally granted Plaintiff's motion for the Court to issue an Order directing Dye to provide Plaintiff with said document. Unbelievably, and in blatant defiance of the Court's order, Dye still refused to provide Plaintiff with the document in question, thus prompting Plaintiff to warn her via electronic request that if she did not provide Plaintiff with the document in question, she could be held in contempt of court. Rather than provide Plaintiff with the requested document, however, Dye issued Plaintiff an incident report for threatening her. This incident report, which was later tossed out by a Lieutenant due to its frivolous, vindictive nature, is also part of the docket since Plaintiff forwarded it to the Court in support of his claim that Dye was still refusing to provide Plaintiff with the required document. Finally, after all of the hastle that Dye put Plaintiff through for months, she decided to give Plaintiff the document that he had been asking her to provide to him -- a simple document that would have only taken her 10 seconds to print off the computer. Once again, the District Court record reflects all of this, and in the course of this lawsuit Plaintiff will make attempts to obtain this record.

When Judge Reinhard denied Plaintiff's request to proceed informa pauperis and informed Plaintiff that he needed to pay a $502.00 filing fee in order to process his appeal, the problems with Dye started all over again. Once again, the docket, this time in the Seventh Circuit Court of Appeals, Case No. 20-2665,

reveals the great difficulty that Plaintiff experienced in trying to get Dye to process his $502.00 money order made out to the Clerk of Court. Every time Plaintiff asked Dye why his money order had not been processed, she'd simply deny ever receiving it from Plaintiff's unit manager, who at the time was Mrs. Kemmerer; and then when Plaintiff asked Kemmerer why she hadn't given Plaintiff's money order to Dye, she would say: "I gave your money order to Mrs. Dye." (Because unknown USP Lee mailroom officials, who Plaintiff is including as defendants in this lawsuit, have refused to allow Plaintiff to have his docket sheets -- even ones that the clerk of this Court recently sent to Plaintiff at his request, -- Plaintiff cannot at this time obtain copies of his docket entries, but will do so later as this case proceeds. (See Exhibit A attached hereto, consisting of a document from USP Lee mailroom officials, notifying Plaintiff that he cannot have his docket sheet, and also of an Order from Magistrate Judge Pamela M. Sargent ordering Warden Streeval of USP Lee to provide the Court with an answer relating to USP Lee mailroom's confiscation of Plaintiff's legal documents.)

(b) Also, recently, defendant Dye, without any justifiable cause, and in agreement with others, placed a complete block on Plaintiff's ability to access the computer/Trulincs on/around November 2, 2021. Plaintiff recently filed a motion in this Court in the case, Marcos F. Santiago v. United States of America, Case No. 7:21-cv-00436-JPJ-PMS, W.D. of Vir., filed 8/5/21, asking the Court for an Order directing Dye to remove the complete block placed on Plaintiff's Trulincs account, which

4

barred Plaintiff from even accessing the electronic law library, in violation of Plaintiff's First Amendment Right to access the Court. In response, the Court ordered the government to respond to said motion by December 7, 2021, which it did. On December 1, 2021, Plaintiff was finally allowed to enter into the computer to access the Bulletin and electronic law library, although he was still denied access to Prison Rape Elimination Act (PREA) officials as well as denied direct access via electronic request to other BOP staff members, including the Warden; and was also denied access to the survey site which allows inmates to answer survey questions posted by the Office of Inspector General periodically dealing with conditions at USP Lee; and, among other things, Plaintiff was also denied access to the medication refill site; denied access to the site where inmates purchase units (which meant that Plaintiff could not print things out, such as legal material and/or the book manuscript he was in the process of emailing to his publisher.   (See Exhibit B attached hereto, consisting of a letter from Plaintiff's publisher, demonstrating that Plaintiff was in the process of emailing his book manuscript to his publisher at the time that defendants not only stripped him of his email under a false pretext, but also blocked his Trulincs account without a just cause. And, among other things, Plaintiff was denied access to the music site, which meant that he could not listen to his MP3 music that he spent well over $1,800.00 for (taking the purchased songs into consideration).

As will become more clear below, this block placed on Plaintiff's Trulincs account by the defendants, was part of a

sinister plot that the defendants were engaged in, whose aim was to cause Plaintiff mental and even physical harm in retaliation for the above-mentioned Tort Claim he filed against the defendants, as well as in retaliation for the book that Plaintiff was in the process of publishing.

## DEFENDANT CALTON

Plaintiff's problem with Counselor Calton (Calton) all began not long after Plaintiff filed a lawsuit in this court for the defendants' negligence in how they handled the Covid-Crisis (i.e., Santiago v. USA, 7:21-cv-00436-JPJ-PMS, 4th Cir., filed 8/05/21). Plaintiff's daughter's mother requested permission from defendant Calton to visit Plaintiff; and, without a just cause, Calton recommended to Warden Streeval that Plaintiff's visitor's request be denied, which Streeval agreed to. (See Exhibit C attached hereto, consisting of the Warden's response to Plaintiff's BP-9 grievance asking him to please reconsider his denial of Plaintiff's visitor's request.) Several factors make it clear that Calton's decision to recommend that Plaintiff's daughter's mother's request to visit Plaintiff be denied, was simply one of many acts of retaliation that Calton directed at Plaintiff:

(1) Plaintiff's daughter's mother, Denise Hoover, has no criminal record except a contempt of court charge for failing to appear at Plaintiff's trial in 2004. Since then she has earned a commercial drivers' license (CDL) and has often been employed as

a  school  bus  driver,  taking  children  to  school.  Plaintiff
believes  that  she  is  still  working  as  a  school  bus  driver,  but
even  if  she  is  not,  because  she  has  no  criminal  record  worth
mentioning,  she  is  still  able  to  work  as  a  school  bus  driver  if
she  chose.* Needless  to  say,  to  get  a  job  as  a  school  bus  driver,
one  must  first  successfully  pass  through  a  rigorous  vetting  or
screening  process.  Obviously,  then,  Denise  Hoover  cannot
possibly  be  a  threat  to  the  security  of  USP  Lee,  as  Calton
suggested.

(2) Every  federal  prison  that  Plaintiff  has  been  to  in  his
20  years  of  imprisonment,  has  granted  Denise  Hoover's  request  to
visit  Plaintiff  --  i.e.,  every  prison  except  for  USP  Lee.
Counselor  Calton  is  the  only  counselor  that  Plaintiff  had  during
the  20  years  of  his  imprisonment  who  recommended  that
Plaintiff's  daughter's  mother  be  denied  permission  to  visit
Plaintiff; and  defendant  Streeval  is  the  only  warden  Plaintiff
had  in  his  entire  20  years  of  imprisonment  who  denied  Denise
Hoover's  request  to  visit  Plaintiff.

It's  possible  that  racism  may  have  also  played  a  role  in
influencing  Calton's  decision  to  deny  Plaintiff's  mother's
request  to  visit  him,  since  she  is  white  and  Plaintiff  is  not.
But  most  certainly  a  desire  to  retaliate  against  Plaintiff  was
the  chief  motivating  factor  in  Calton's  decision  to  deny  his

---

* Plaintiff  no  longer  has  close  ties  with  his  daughter's  mother,
but  he  recently  asked  his  Mother  to  message  his  daughter's
mother  via  Face  Book,  in  order  to  ask  her  if  she  has  received
any  other  criminal  charges  besides  the  one  she  received  in  2004
for  failing  to  appear  at  Plaintiff's  trial.  Denise's  answer  was
no  --  nothing  except  for  a  few  traffic  tickets.

his daughter's mother's request to visit him. As Plaintiff will now demonstrate, something much more sinister was going on behind the scenes -- a plot engaged in by Calton and multiple other staff members of USP Lee, not only to retaliate against Plaintiff, but also apply maximum pressure to Plaintiff in the hope that it would cause Plaintiff to act out in an aggressive manner (as Plaintiff has done in the past due to certain issues that he hadn't fully resolved), so they could ship Plaintiff back to the SMU, among other things. The defendants, as Plaintiff will demonstrate below, even went so far as to attempt to induce other inmates to harm Plaintiff.

Plaintiff will refer to the denial of his daughter's mother's request to visit Plaintiff, as Plan A of the defendants' vicious scheme to, among other things, apply maximum pressure to Plaintiff in order to induce him to act out with aggression so they could get rid of him, since any outburst on Plaintiff's part was bound to get him sent back to the SMU program where he was housed before entering into USP Lee.

When Plan A of the defendants' plot against Plaintiff failed to achieve the results the defendants were hoping for and undoubtedly expecting, they turned to plan B. And this is where Defendant Sexton, Plaintiff's case manager, enters into the picture.

DEFENDANT SEXTON

Around the time that Counselor Calton and Warden Streeval denied Plaintiff's daughter's mother's request to visit him, Plaintiff was also experiencing a separate issue concerning the unlawful taking of his money to pay for restitution that had already been paid off as far back as 2017 -- a fact that Plaintiff only recently discovered, however. When Plaintiff recently discovered that his brother and former codefendant, Alfredo Santiago, had paid off the restitution imposed on them by judge Timothy J. Savage of Philadelphia, PA, as far back as 2017, Plaintiff immediately motioned the Court for an order instructing the government to stop taking Plaintiff's money, since the restitution had already been paid off in full; and to return to Plaintiff all of the money that was wrongfully taken from his account since 2017. The government, in response, conceded that:

(1) Plaintiff's money should no longer be taken from him since, as Plaintiff maintained, the restitution had been paid off in full several years earlier; but that,

(2) Plaintiff's request for the government to return all of the money that he paid since 2017, when Plaintiff's brother paid off the restitution in full, should be denied since the extra money that Plaintiff paid was for interest (although, in the government's own words: "The Court waived the interest on the judgment with respect to Alfredo Santiago, but not with respect to the defendant..."). (See Exhibit D attached hereto, consisting of the government's response, in USA v. Santiago, 03-

9

157-01.)

Now, as Exhibit D reflects, the government emailed Sexton sometime in August of 2021, instructing him to stop taking Plaintiff's money; and Plaintiff even attempted to hand to Sexton the government's response on several occasions, but Sexton simply refused to accept it from Plaintiff. And so, despite the fact that the government emailed Sexton and told him to stop taking Plaintiff's money, money was again deducted from Plaintiff's account on two more occasions -- once, on/around September 9, 2021, just a few days after Judge Savage denied as moot Plaintiff's motion for the defendants to stop taking Plaintiff's money (see Exhibit E attached hereto, consisting of Judge Savage's order dated September 1, 2021); and again on/around November 9, 2021.

In September of 2021 Plaintiff filed a BP-8 complaint against Sexton, but because Plaintiff never received a response and was even told by Calton that he didn't know what happened to the BP-8, Plaintiff had to file a second BP-8 complaint to ask that Sexton cease taking money from his account for restitution purposes. (See Exhibit F attached hereto, consisting of Plaintiff's second BP-8 in which he complained that money was still being taken from his account even after the government emailed Sexton to tell him to stop doing so.)

Now, as exhibit F also reflects, Sexton's response to Plaintiff's second BP-8 complaint, dated 10/1/21, was:

> "No correspondence that I'm aware of has been received concerning your IFRP obligation. Please provide a receipt of payment from the sentencing Court, and once verified, I will adjust your obligation accordingly. /S/ J. Sexton"

Sexton gave this answer an entire month after the government emailed him telling him to not take any more of Plaintiff's money, and even after Plaintiff filed a second motion before Judge Savage to notify His Honor that, despite his order, money was still being taken from Plaintiff's account. And, as previously mentioned, Plaintiff attempted to show Sexton the government's response on several occasions, and, now, even the Court's order (exhibits D and E, respectively), but Sexton simply brushed Plaintiff off and refused to even look at what Plaintiff was trying to show him. It was only sometime in late October of 2021, after Plaintiff filed a BP-9 and then was in the process of preparing to file a BP-10 with the Regional Director for the Mid-Atlantic region complaining about this issue, that Sexton decided to fix the problem. And as he was fixing the problem in his office with Plaintiff present, he said something to Plaintiff that leaves no room for doubt that his actions relating to the matter in question were intentional, and that he was part of a conspiracy engaged in by multiple staff members, named and unnamed, to harm Plaintiff. He said:

> "You didn't hear this from me, but I was told not to touch this [meaning, not to fix the issue Plaintiff was having with his money being taken from him even after the restitution had been paid off in full years earlier, but instead to leave it as it was]."

Who that person was that instructed Sexton to not fix the issue that Plaintiff was having, so that money would continue to be taken from his account, Plaintiff does not know. But this is where Plaintiff really began to realize that something sinister wsa going on behind the scenes -- a plot of some sort to harm Plaintiff. To cause Plaintiff to fall into a trap that the

11

defendants were laying for Plaintiff.

Plaintiff will refer to Sexton's months-long intentional decision to not fix the problem of money being unlawfully taken from his account, which he was instructed to do by some unknown official working in the same facility, as plan B of the defendants' scheme to apply maximum pressure to Plaintiff in the hope that it would cause Plaintiff to explode, so they could deal swifly with him no doubt in a forceful manner, escort him to the SHU, falsify incident reports against him, get him sent back to the SMU program, and, among other things, hamper his ability to publish a book that he was in the process of sending to his publisher via email, section by section; as well as to interfere with his ability to proceed with his Tort Claim civil suit that Plaintiff filed against the defendants for the drastic mishandling of the Covid-19 crisis on their part.

DEFENDANT HALL

When plan A and B of the defendants plot against Plaintiff failed to work, they turned to plan C. And that's where officer Hall enters into the picture. Plaintiff has previously attached to one of the miscellaneous motions he filed in this Court, in Santiago v. USA, 7:21-cv-00436, 4th Cir. 8/5/21, a printed out copy of an email request he sent to Warden Streeval complaining about his counselor (Calton). And, as Plaintiff demonstrated in the above-mentioned miscellaneous motion, the very next after Plaintiff complained to Warden Streeval about Counselor Calton

12

for his refusal to do his job, officer Hall entered Plaintiff's
cell and left it in such a mess that it took Plaintiff roughly
30-40 minutes to put it back in order. But, far worse, he also
falsified an incident report in which he accused Plaintiff of
being in possession of a heating device. Ironically, instead of
giving Plaintiff a 200 series shot so he would be seen by the
DHO, Hall issued a 300 series shot to Plaintiff so he would be
seen by defendant Calton, which was undoubtedly part of the
conspiracy between Calton and Hall to harm Plaintiff. A 200
series incident report (shot) is more serious than a 300 series
shot, but every inmate in USP Lee knows, and the record will
prove, that the DHO is much more merciful than some counselors,
especially Calton. For instance, a white inmate on Plaintiff's
unit recently went before the DHO for fighting and for
possessing wine (both of which are 200 series shots), and only
lost his commissary privilege for six months. He didn't want to
get involved when Plaintiff asked him to provide him with an
affidavit, for fear of retaliation.  Calton, on the other hand,
took Plaintiff's phone privilege for an entire year for this
300 series shot for allegedly being in possession of a heating
device. Plaintiff only called two people on the phone before
Calton stripped his phone privilege from him, i.e., his 71-year
old mother who lives in Puerto Rico, and his 86-year old
grandmother who lives in Manhattan, and who is currently
battling cancer (not to mention the Covid-19 disease that she
and everyone else in the world is constantly threatened by).

13

Despite these facts; and despite the fact that the United States is currently in a state of emergency, for which reason inmate phone calls throughout the prison system are currently free so that, regardless of an inmate's financial situation, all inmates may still keep in contact with their loved ones -- despite all of these facts, Calton stripped Plaintiff of his phone privilege for a year, and undoubtedly did so believing that it would do the trick of getting Plaintiff to act out in an aggressive manner and fall right into the trap that the defendants were setting for Plaintiff. But plan C of the defendants also failed to work, for Plaintiff kept the words of the ancient slave philosopher, Epictetus, always in mind:

> "It is not what happens that afflicts this person, but his ⌊or her⌋ judgment concerning it."

Now, Plaintiff had been in USP Lee, in the same unit, for an entire year before he received an incident report for possessing a heating device, and his cell had been searched by many officers within that time on multiple occasions. And at no time did any officer ever find a heating device in Plaintiff's cell. As a matter of fact, at no time in Plaintiff's entire 20 years of imprisonment did he ever receive an incident report for possessing a heating device, and his cell during these last 20 years had been searched hundreds, if not thousands of times by countless officers, including even during mass "shake downs" during which any contraband an inmate may have, will be found. At times Plaintiff wondered if a former cellmate of his may have left it behind in his locker; but today Plaintiff is

14

certain that Hall planted a heating device in Plaintiff's cell,
and that he was part of a conspiracy engaged in by all the
defendants named herein to cause Plaintiff harm. Plaintiff has
met several other inmates who received the same incident report
in USP Lee, and all of them were charged with a 200 series
shot, not a 300 series shot. Giving Plaintiff a 300 hundred
rather than a 200 series incident report was no doubt part of
the defendants' scheme against Plaintiff, as that would have
ensured that Plaintiff would be disciplined by the very same
individual who he had dared to complain about -- i.e.,
counselor Calton. This will become more clear shortly.


## Back to Defendant Calton

When plan C failed to work, the defendants turned to what
Plaintiff will call plan D. That is, in October of 2021, none
other than defendant Calton himself issued Plaintiff two
extremely petty incident reports, one right after the other.
One of these shots was for having an untidy cell, since
Plaintiff had his vent covered; and the other shot was for
allegedly having a clothes line up in his cell. Now, it is true
that Plaintiff did have his vent partially covered (to prevent
or reduce the amount of dust particles entering into his cell
through the unfiltered ventilation system of USP Lee), but
Plaintiff has had his vent partially covered for the entire
year that he's been in USP Lee, and counselor Calton has often
seen it while making his rounds (especially during times when
USP Lee inmates were locked in their cells); and at no time did

15

he ever issue Plaintiff an incident report for it -- until now, that is, after Plaintiff complained about him to Warden Streeval. As for the incident report for the clothes line that Calton issued to Plaintiff only a few days after issuing the first incident report to Plaintiff, Calton completely falsified everything he said in his report, as Plaintiff did not have a line up in his cell. He intentionally made it up. And, once again, the proof of the fact that Calton falsified this incident report against Plaintiff lies in the fact that he himself had never previously written Plaintiff up for having a clothes line hanging up in his cell; nor has any other officer, including the inspectors who pass through every unit in USP Lee every Tuesday to ensure that every inmates' cell is in order. Only now, a little over a year after Plaintiff had been on the same unit that Calton has worked on as a counselor the entire time; and not long after Plaintiff filed his tort claim in court and began sending his book manuscript to his publisher and complained to the Warden about him not doing his job, has Calton decide to issue Plaintiff these petty incident reports. (Plaintiff does not have copies of these incident reports at the time, but has previously attached them as exhibits to certain miscellaneous motions he filed in this court, in Santiago v. USA, 7:21-cv-00436 (W.D. of Vir.)).

Because Calton himself issued the incident reports to Plaintiff, Plaintiff was seen by a different disciplinary officer at USP Lee, and thus only lost his visiting privileges

16

for several months (which really didn't affect Plaintiff at
all, since Calton had already denied his daughter's mother's
request to visit him around the same time, without a just
cause). Though Calton issued several other inmates similar
incident reports around the same time, Plaintiff has reason to
believe that he did that to disguise the fact that Plaintiff
was the main target of his retaliation, as was revealed to him
by unit officer Bradburn (when he worked on Plaintiff's unit)
who enlightened Plaintiff to the fact that Calton had it in for
Plaintiff and was "coming after" Plaintiff. On one occasion, in
the presence of Plaintiff's cellmate at the time, A. Alfadhilis
(Reg. No. 51559-039), officer Bradburn approached Plaintiff's
cell to bring him his mail and said to Plaintiff:

>  "Man, they want you bad, Marcos. You better watch it.
>  Everytime I go back there [i.e., the offices where Calton
>  and Sexton work], they're talking about you..."

Since Calton usually works first shift and, from what Plaintiff
remembers, Bradburn usually worked the second shift, Bradburn's
encounters with Calton must have been brief and have occurred
shortly after his arrival for his shift (usually about 15
minutes before his shift started), but before Calton departed
once his shift was up. The mail that Bradburn brought to
Plaintiff at the time in question, was a response to a BP-8
or BP-9 that Plaintiff filed with Counselor Calton, and which
Calton gave to Bradburn to give to Plaintiff shortly before his
shift ended. A. Alfadhilis himself has recently been set up by
officer Hall and Bryant, as Plaintiff will explain later in
greater detail. At this time, since A. Alfadhilis is currently

17

in the USP Lee's Special Housing Unit (SHU aka "hole"),
Plaintiff cannot obtain an affidavit from him elaborating on the
retaliation that he himself has recently been subjected to by
officers Hall and Bryant, but will attempt to do so through the
Court in due time. As previously mentioned, A. Alfadhilis was
present when Bradburn told Plaintiff that his unit team members
were coming after him, and that he (Plaintiff) had better watch
himself. Although at that time A. Alfadhilis was not inclined to
provide Plaintiff with a sworn affidavit as to what Bradburn
told Plaintiff, mainly for fear of retaliation, Plaintiff
believes that, now that he has received a small taste of what
Plaintiff has been subjected to for months by various USP Lee
officers since about September of 2021, he may now be more
inclined to provide Plaintiff with a sworn declaration.
Regardless, Plaintiff will elaborate on the harrassment
and even threats of physical violence, that A. Alfadhilis
received at the hands of officers Bryant and Hall later in this
document -- facts that are relevant to Plaintiff's own case.

Plaintiff, however, didn't need officer Bradburn to tell
him what he already knew from the defendants' actions --
i.e., that Calton and Sexton, among others, had it in for
Plaintiff; and that they were part of a plot to place Plaintiff
under tremendous psychological and even physiological pressure
(USP Lee's Dr. York recently prescribed a second medication to
Plaintiff to help bring down his highblood pressure -- the
result, no doubt, of the extra stress Plaintiff is under because
of the defendants) on the belief that it would induce Plaintiff
to act out in an aggressive manner and thus provide defendants

18

with the perfect excuse to rough him up, toss him into the SHU, and then SMU him, among other things.

## Defendant S.I.S. T. House

When plan D failed to work, the co-conspirators turned to plan E -- a much more desperate and viscious plot on the part of the defendants, as Plaintiff will now adequately demonstrate.

As Exhibit G attached hereto reflects, on November 2, 2021, after conducting a months-long investigation and intelligence gathering operation against Plaintiff, S.I.S. T. House decided that the time was ripe for swooping in and issuing Plaintiff and two other inmates an incident report for accepting/receiving money without authorization. It's clear that what S.I.S. investigator T. House's true motive was for issuing this incident report to Plaintiff and two other inmates, was to cause Plaintiff psychological and physical harm. First, let's consider box number 4 of exhibit G, which reads: "Date of incident: 9-30-2021". This date makes it clear that S.I.S. investigator T. House had his eye on Plaintiff around the same time that the other above-mentioned defendants also had their eyes on Plaintiff -- namely, Sexton, Calton, and Hall.[*] This date, among other things, suggests a connection between T. House and the other defendants named herein.

[*] Plaintiff has reason to believe that many other individuals who work here at USP Lee were part of the scheme/conspiracy to harm Plaintiff, but Plaintiff leaves them unnamed for now since he has no direct evidence on them to demonstrate their involvement sufficient to satisfy the preponderance of the evidence standard.

Turning now to box 10 of Exhibit G, we see that, ironically, T. House's incident report was, not a 200 series shot, but rather a 300 series shot. Now, the last line in T. House's report reads: "This report was delayed due to investigation and intelligence gathering." One would think that a prison infraction that required a months-long investigation and much intelligence gathering, indicating that something very serious was going on, would have resulted in, at the least, a 200 series shot being issued, not a petty 300 series shot being issued (which was destined to fall right into Calton's lap -- again!). But that's what S.I.S. T. House chose to do, by conscious design, no doubt. It was part of the plot to harm Plaintiff, which he was undoubtedly involved in.

Now, if someone were to ask T. House why he decided to issue Plaintiff an incident report, his answer would undoubtedly be something like: "Santiago committed an infraction that I deemed to be serious enough to warrant an incident report being issued against him." Well, why, then, did he issue one of the least serious incident reports that an officer can issue, when he could have easily charged it as a 200 series shot (which, by the way, he actually was supposed to do since it was Plaintiff's fourth shot that he received in such a short period of time)? Defendant T. House's incident report doesn't even state what exactly the wrong was that Plaintiff and the two other offenders engaged in. It simply says that Plaintiff received money from an outside source who happens to know other inmates in the same institution. What violation is that? Of course, since T. House

was part of a scheme to harm Plaintiff, his incident report was intentionally ambiguous and bereft of details, in order to justify a 300 series shot so that it would land right on Calton's lap.

More significantly and more telling, however -- and this is where the vicious nature of T. House's incident report lies, -- T. House decided to mention in this report of his, which all three inmates received (i.e., Shamar Pitts, Eric Sancho, and Plaintiff), the exact amount of money that Plaintiff had in his account. Why? T. House tells us himself at the end of his incident report, that he conducted a months-long investigation and intelligence gathering with respect to Plaintiff. And no doubt a part of his months-long investigation included an inquiry into where Plaintiff received $2,500.00. So he must have known that nearly every cent of Plaintiff's money came from the government itself in the form of three stimulus checks that Plaintiff received from the IRS, pursuant to the CARES Act. But yet he still decided to mention the exact amount of money that Plaintiff had in his account, as if it had been obtained through some sort of unlawful scheme, when he knew exactly how Plaintiff had obtained this money.

Clearly, T. House's goal was to let the other two inmates, who also received the same exact incident report, know exactly how much money Plaintiff had in his account, in the hope that it would induce and/or inspire the other two inmates to extort Plaintiff, and, if necessary, to even use violent physical force against Plaintiff. Defendant T. House had absolutely no reason

21

for including in his incident report the exact amount of money (i.e., $2,500.00) that Plaintiff had in his account, when he must have known through his thorough investigation where the money came from -- i.e., from the I.R.S. This was no mere accident on T. House's part. This was not a case of a reporting officer making an honest mistake. There was a design and purpose behind T. House's decision to include in Plaintiff's incident report, the exact amount of money that Plaintiff had in his account. The role that S.I.S. T. House plays in USP Lee is akin to the role that the FBI play in free society; and as such, he, more than any other officer, knows what takes place in the prison, including thefts, extortions, robberies, etc. He knew that mentioning the amount of money that Plaintiff had in his account could possibly cause Plaintiff harm, and he still decided to mention it in his incident report. And that, even though he undeniably knew that every cent of it was obtained in a lawful manner from the very government that he works for. He conducted a thorough investigation, as he himself said in his report. And defendant T. House did have a motive for wishing to cause Plaintiff harm, along with other defendants. He was the one reading Plaintiff's book manuscript as Plaintiff was in the process of emailing it, section by section, to his publisher, as indicated by the facts that (1) he himself was the one who recommended to Warden Streeval of USP Lee that Plaintiff's access to Trulincs be blocked, and he told Calton to strip Plaintiff of his email privilege. See Exhibit H attached hereto, consisting of Defendant Dye's response to a BP-8 complaint

22

Plaintiff filed regarding the block placed on Plaintiff's account.) More on Exhibit H in just a moment.

Just recently, in a separate case Plaintiff filed in this Court for Covid-19 related reasons (see Santiago v. USA, 7:21-cv-00436-JPJ-PMS (W.D.of Vir.), Plaintiff filed a motion for injunctive relief, i.e., an order from the Court directing Warden Streeval to give to Plaintiff the docket sheet that USP Lee mailroom officials confiscated from Plaintiff. Honorable Judge Sargent ordered the Warden to respond, and in response, among other things, the Supervisory Correctional Systems Specialist Charles Barnett filed a declaration stating for the Court his reasons why it was important for USP Lee officials to confiscate inmates' docket sheets that they order from Court clerks. In relevant part he wrote in paragraphs "9" and "10" of his declaration:

> "Many docket sheets contain information regarding an inmate's...financial resources...In response to the Bureau prohibiting inmates from possessing Presentence Reports (PSRs) and Judgment and Commitment (J&C) Statements of Reason (SOR), there is an emerging problem where inmates pressure other inmates for a copy of their docket sheet...to learn if they...have financial resources..."

(Case 7:21-cv-00436-JPJ-PMS Document 45-1 Filed 02/03/22 Page 2 of 3 Pageid#: 310.)

So, USP Lee officials didn't want Plaintiff to have his docket sheet on the ground that, among other things, they were trying to protect him from other inmates who may be trying to learn what Plaintiff's financial resources are. Sounds good. Why, then, did these same USP Lee officials let other inmates know exactly what Plaintiff's financial resources were? The

23

very thing that one USP official (Charles Barnett) claimed that
he was trying to protect Plaintiff from, i.e., other inmates
obtaining knowledge as to how much money Plaintiff had in his
account, is the very thing that another USP Lee official (T.
House) did, i.e., let other inmates know exactly how much money
Plaintiff had in his account -- all $2,500.00 of it.

One thing that Charles Barnett's declaration makes clear,
is that BOP officers in general and USP Lee officers in
particular are trained to utilize every means necessary for
ensuring that an inmate's financial resources are kept private
and known only to that inmate, as well as trained to employ
methods for preventing other inmates from obtaining such
information -- especially a BOP officer like T. House who is an
SIS investigator. T. House's decision, therefore, to let other
inmates know the exact amount of money that Plaintiff had in his
account -- money, by the way, which he no doubt knew came from
the IRS in the form of three stimulus checks --, makes sense
only if it is seen as part of a scheme to harm Plaintiff that T.
House and others were engaged in.

The other part of T. House's vicious plan to harm
Plaintiff, was his decision to charge his incident report as a
300 series rather than as a 200 series shot, so that all three
offenders (i.e., Plaintiff, Eric Sancho, and Shamar Pitts) would
be punished by defendant Calton (who he could and did
influence), rather than by the more lenient DHO (who he could
not influence, since the DHO works for the Regional Director for
the Mid-Atlantic Region, not the Warden of USP Lee), in the hope

that it would anger the other two offenders and induce them to
turn on Plaintiff in a violent manner. And sure enough, when all
three offenders were seen by Calton in Sexton's presence, each
offender was stripped of their email privileges for an entire
year -- the one privilege that they all used the most,
especially Plaintiff who at this time was roughly 80% of the way
through emailing his transcript to his publisher. Once again, T.
House's goal was to turn Shamar Pitts and Eric Sancho against
Plaintiff. And here's the proof of this. When Shamar Pitts was
being seen by Calton, Shamar said in shock after Calton hammered
him with one-year loss of email:

> "Why are you taking my email for a year? Can't you take my
> phone away and leave my email?"

To which Calton replied: "SIS [T. House] who issued the shot
told me to take all of your emails." A slip of the tongue, on
Calton's part, no doubt. The very individual who issued the
incident report, is now deciding the punishment? And why
specifically their email privilege? And why a 300 series shot,
not a 200 series shot as it should have been? And why mention
the amount of money Plaintiff had in his account?

Once again, T. House had a motive to join the defendants'
conspiracy to harm Plaintiff and get rid of him. He knew about
the book that Plaintiff was in the process of emailing to his
publisher and obviously wished to prevent it from being
published (Plaintiff, who has been in prison for 20 years now,
didn't shy away from writing about certain negative experiences
of his in the American so-called criminal justice system --

25

things which members of America's criminal justice system naturally would not want to be published, but which none of them have to a right to prevent in light of the First Amendment right to free speech.) Exhibit H attached hereto supports Plaintiff's claim in several ways. First, it makes it clear that SIS T. House is the individual who recommended that a block be placed on Plaintiff's Trulincs account (besides the fact that he recommended that Plaintiff's email privilege be stripped from him); and that he recommended it the same day that he issued his incident report to Plaintiff, Shamar, and Sancho. Of these three inmates, however, Plaintiff was the only one whose Trulincs account was blocked, although all three inmates received the same exact incident report. Clearly, T. House was after Plaintiff, not the other two inmates, who T. House involved only to help carry out the defendants' vicious and shameful plot against Plaintiff to cause him major harm. It cannot be doubted that Plaintiff was the sole target of T. House and the other defendants' scheme to harm Plaintiff, physically and psychologically, as will become more clear shortly.

Exhibit H also reveals that no single reason was provided as to why Plaintiff's Trulincs account was blocked, at T. House's recommendation and defendants' Streeval and Dye's complicity. Rather, three reasons are suggested, which are:

(a) Plaintiff's account was blocked for disciplinary reasons;

(b) Plaintiff's account was blocked for investigation

26

reasons; and,

(c) Plaintiff's account was blocked because he posed a threat to the security of the prison, as well as posed a threat to the safety of staff and inmates.

Although the defendants didn't identify any specific reason for the block they placed on Plaintiff's account, the government, on page 2 of its "Response To Plaintiff's Motion To Remove Block On "Account"", see Santiago v. USA, 7:21-cv-00436-JPJ-PMS (W.D. of Vir.), document 25, filed 12/7/21, identified reason (a) as being the reason as to why Plaintiff's account was blocked. The government wrote in its above-mentioned "Response", in relevant part:

> "...Santiago's Trulincs access was disallowed for six months beginning in November 2, 2021, pursuant to Program Statements 4500.11, 5264.08, and 5265.14 DUE TO INCOMING MONEY FROM OUTSIDE PERSONS ASSOCIATED WITH MULTIPLE OTHER INMATES..." (emphasis added)

But if Plaintiff's Trulincs account was truly blocked because of the incident report he received for receiving/sending money, as the government maintained, then why is it that the other two inmates who received the same exact incident report as Plaintiff, i.e., Shamar Pitts and Eric Sancho, didn't also receive the same sanction? Why wasn't their Trulincs account and money (i.e., $350.00) also frozen or blocked as happened to Plaintiff? Clearly, there's more to the story as to why the defendants decided to block Plaintiff's, and only Plaintiff's Trulincs account. Clearly, reason (a) could not be the real reason why Plaintiff's account was blocked, or the other two inmates who received the same exact shot would

27

also have been barred from accessing Trulincs. (As to
Plaintiff's money being froze, i.e., $350.00, see exhibit I
attached hereto, consisting of two commissary receipts
reflecting the fact that, between November 8, 2021 and November
15, 2021, roughly $350.00 of Plaintiff's money was frozen by
the defendants. The first receipt reflects the fact that
Plaintiff had $2,059.38 in his account but only $1,737.88
available to him, since in 2017 the DHO of FCI Allenwood froze
$321.50 of Plaintiff's money. The second receipt, however,
reflects the fact that, a mere week later, Plaintiff now had
$2,002.98 in his account but only $1,331.48 of it available to
him.) This leaves reasons (b) and (c) as the possible reasons
for the block being placed on Plaintiff's Trulincs by the
defendants. That is, that Plaintiff is (b) under investigation
and/or that (c) Plaintiff posed a threat to the safety of staff
and inmates.

But if Plaintiff was under investigation, then why did T.
House write at the end of his incident report (Exhibit G):
"This report was delayed due to investigation and intelligence
gathering," which suggests that, at the time that he decided to
issue Plaintiff the incident report in question, his
investigation of Plaintiff had come to an end?
Exhibits G and H make it clear that T. House recommended that a
block be placed on Plaintiff's Trulincs account after his
investigation of Plaintiff had come to a conclusion, at which
he issued the same incident report to three individuals -- once
again, Plaintiff, Shamar Pitts, and Eric Sancho. He didn't

recommend that Plaintiff's Trulincs account be blocked <u>during</u> the investigation, but only <u>after</u> his investigation of Plaintiff had come to an end, which supports Plaintiff's claim that the block on Plaintiff's account was simply part of the scheme of retaliation and vindictiveness against Plaintiff that T. House was engaged in together with other defendants.

And, once again, because T. House didn't also recommend to the Warden that Shamar Pitts and/or Eric Sancho's Trulincs account be blocked, neither reason (a) or (b) can be the true reason for the block. That leaves reason (c). But if Plaintiff truly did pose a threat to the security of the institution, or a threat to the safety of staff and inmates, then why was he not immediately removed to the SHU? Why is he not in a supermax? And, most mindboggling of all, why did the defendants always choose to give Plaintiff 300 series shots for every one of his incident reports, not 200 series or even the more serious 100 series shots? Clearly, something else was going on here. And that something else is what Plaintiff has been claiming all along, i.e., that the defendants were engaged in a wicked scheme to bring about the downfall of Plaintiff in order, among other things, to repress Plaintiff's First Amendment right to free speech, since Plaintiff was in the process of emailing his book manuscript to his publisher, which, among other things, dared to sharply criticise certain aspects of America's so-called Criminal Justice System, or, as many federal inmates put it, the "Just Us" system -- a book that the defendants were seemingly hell-bent on making sure was

29

never published.*

Returning to Defendant Dye

In exhibit H attached hereto -- i.e., Dye's response to Plaintiff's BP-8 complaint concerning the block placed on Plaintiff's account, -- she hypocritically characterized the block that was placed on Plaintiff's access to the electronic law library (as a result of the block placed on Plaintiff's Trulincs account), as an "error". But Plaintiff brought this "error" to her attention and to Warden Streeval's attention on several occasions between November 2, 2021 (the day the block was recommended by T. House and approved by Warden Streeval) and December 1, 2021 (the day Plaintiff was finally allowed to enter the computer to access the law library); and not one time during this entire month did the defendants ever fix the problem. Warden Streeval would simply hand Plaintiff's request for law library access to Dye, and she'd simply fold it, put it in her pocket, and do absolutely nothing to help Plaintiff gain access to the electronic law library function of the computer. It was only after U.S. Magistrate Judge Pamela M. Sargent, in Plaintiff's case Santiago v. USA, 7:21-cv-00436, W.D. of Vir., intervened in response to a motion for injunctive relief that Plaintiff filed, that the defendants finally decided to fix the problem. Had it not been for the Court's order for the defendants to answer the

---

* On January 25, 2022, the Regional Director for the Mid-Atlantic region expunged the incident report that T. House issued to Plaintiff, and Plaintiff's email and full access to Trulincs was restored. More on this later.

question as to whether Plaintiff was denied access to the
electronic law library, Plaintiff's access to the law library
would still have been restricted most likely until the day (i.e.,
January 25, 2021) when the Regional Director restored to
Plaintiff his email privilege and full access to the computer,
after first expunging T. House's incident report against
Plaintiff, which he obviously deemed to be frivolous and suspect.

Defendant Dye also falsely claimed in her response (exhibit
H) that Plaintiff not only had access to the law library and
bulletin board, but access also to the print function. This was a
blatantly false statement on her part, since, as she no doubt
knew, Plaintiff was barred from accessing the "manage units" site
on the computer due to the block placed on Plaintiff's account,
without which it is impossible for inmates to print anything out.
Printing material out costs money or rather units that inmates
must buy prior to printing anything out, such as caselaw, emails,
etc. So if an inmate is prevented from accessing the site where
he or she may purchase units, then that inmate simply would not
be able to print anything out. Defendant Dye most certainly was
aware that Plaintiff could not print anything out since he was
blocked from accessing the "manage unit" site; so it was obvious
a conscious and deliberate lie on her part for her to claim that
Plaintiff had access to the print function of the computer. (See
exhibit J attached hereto, consisting of an affidavit from inmate
Anthony Gardner, who is a witness that Plaintiff could not access
the "manage unit" site on the computer at the time in question
and thus was virtually denied access to the print function.)

31

Defendant Dye was also deliberately being misleading in another way in her response as well (Exhibit H). On several occasions Plaintiff had expressed his fear that, because of the block placed on his account, he was being deprived of a direct line of access to outside government PREA officials, which would have been necessary in the event that he was ever physically assaulted by staff members (who, after all, were clearly after Plaintiff). Defendant Dye's answer to Plaintiff on this was:

> "...All information in reference to the Prison Rape Elimination Act (PREA) is posted throughout the facility and covered during orientation for every inmate."

Plaintiff's complaint was not that he was being deprived of information on PREA, but that, due to the complete block placed on his Trulincs Account by defendants, he was being deprived of a direct line of access to PREA officials in the event that he was ever assaulted by staff. It is very important for Plaintiff to have access to PREA officials and the Office of the Inspector General, especially at this time when, besides all of the above, Plaintiff's outgoing mail is also apparently being trashed by the guards who work on Plaintiff's unit.* Exhibit K attached hereto, for example, consists of several letters that Plaintiff recently received from his 72-year old mother, Teresa Dejesus, in one of which she wrote in relevant part:

---

* Plaintiff believes that he knows exactly which unit officer was trashing his mail, but since he can't prove it, Plaintiff declines to mention his name. Plaintiff dropped his mail in the unit mailbox while this particular guard was working, but this particular guard can easily deny ever having retrieved Plaintiff's mail from the box, and that will be the end of the story.

32

"...long time I don't hear from you. I hope you are doing
okay. I wrote to [the officials here at USP Lee to inquire
into what was going on with Plaintiff, since she hadn't
heard from Plaintiff in a while] they wrote me back saying
that they cannot tell me about you but I can  write  a
letter [to Plaintiff]. I hope they deliver this mail to
you.  I told Sarah [Plaintiff's sister] to write to them
too. I hope you are doing ok. And I hope soon we can
communicate true email...I'm worry about you, especially
[since I haven't heard from you, either through] letter,
email, or nothing..."

Plaintiff's mother's letter, in addition to others from her

that Plaintiff recently received that are also part of Exhibit

K attached hereto, make it clear that she never received any of

the letters that Plaintiff sent to her within the time that

Calton stripped Plaintiff of his email privilege in early

November of 2021 to January 25, 2022, when Plaintiff's email

privilege was restored after the Regional Director expunged the

shot   that   T.   House   issued   against   Plaintiff   for

receiving/sending money without authorization. Plaintiff always

communicated with his mother via email (if not via the phone),

and so, when Plaintiff lost his email privilege, because he

couldn't call his mother (since Calton took Plaintiff's phone

for a year also), he immediately wrote a letter to his mother

in order to let her know that he couldn't email her anymore,

but that he would write her letters the old fashioned way.

Plaintiff wrote her this letter because he didn't want her to

worry when she didn't hear from Plaintiff via email. But that

letter as well as many others that Plaintiff addressed to his

mother, was trashed by a prison worker whose identity is not

exactly known, although Plaintiff has an idea of who it was who

violated federal law by trashing Plaintiff's mail.

It's clear that the defendants were engaged in some type of scheme to apply maximum pressure to Plaintiff in the belief that it would make Plaintiff act out aggressively, so they could get rid of him; could punish him; could assault Plaintiff and get away with it; could falsify incident reports against him and have Plaintiff sent back to the SMU; could retaliate against Plaintiff for the Covid-related Tort Claim that he filed against them and for daring to complain against Calton; could suppress Plaintiff's First Amendment right to publish a book, etc. And blocking as much of Plaintiff's access to the outside world -- even to other government officials, such as PREA or the Office of the Inspector General -- was undoubtedly part of the defendants' wicked plot against Plaintiff. This much is very obvious. First, the defendants took Plaintiff's phone; then they took Plaintiff's email; then they took Plaintiff's direct line of access to PREA officials as well as to the OIG by placing a complete block on Plaintiff's Trulincs account under a false pretext; and then, lastly, they trashed all of the letters that Plaintiff mailed to his 72-year old mother, in violation of federal law. The defendants cannot possibly put forth, in good faith, a justifiable reason as to why they considered it necessary to block Plaintiff's ability to contact PREA officials, or to answer surveys put out by the Office of the Inspector General. They're all over the place with their answer (exhibit H).

First, it was part of the disciplinary action against

Plaintiff for his infraction of receiving/sending money without
authorization (but, if so, then why did the other two inmates
who received the same exact incident report not also experience
the same block against their Trulincs account or a freeze on
their money?); then it was part of an investigation (but, if
so, then why did they not ever issue an incident report against
Plaintiff for abusing Trulincs; and why did they not also
recommend blocking Shamar Pitts and Eric Sancho's Trulincs
account, who received the same exact incident report Plaintiff
received?); and then, lastly, they also suggested that
Plaintiff is a major threat to the security of the institution
(but, if so, then why did they always issue Plaintiff a bunch
of absolutely petty 300 series rather than 200 or, worse, 100
series incident reports? And why was not Plaintiff immediately
removed from general population and placed in the Special
Housing Unit ("hole"), if he truly posed a threat to the
security of the institution? (The defendants, the Court may
recall, also deemed Plaintiff's daughter's mother, a school bus
driver, to also be a threat to the security of the institution,
despite the fact that the only crime she was ever convicted of
was contempt of court for failing to appear at Plaintiff's
trial in 2004 -- 18 years ago. Clearly the defendants lack
credibility.)

What it all comes down to is this: besides the fact that
Plaintiff filed a lawsuit against USP Lee officials for the
reckless manner in which they handled the Covid crisis in USP
Lee, he was also in the process of writing a book in which,

among other things, he exposed certain corrupt aspects of American's Criminal Justice system -- e.g., the torturous SMU program; the vicious beatings inmates often receive at the hands of prison officials; the unjust sentences; the denial of medical attention; the extreme negligence; the tensions in the inmate population created by certain BOP officials that endanger not only the lives of inmates, but also even the lives of the guards themselves; etc.

The defendants were obviously not very happy with some of the things that Plaintiff was writing in certain sections of his book; but clearly Plaintiff's book contained nothing in it that was a violation of any state or federal law or BOP policy, or the defendants would most certainly have issued Plaintiff an incident report for it (instead of issuing Plaintiff a bunch of petty 300 series shots that were simply the pretext the defendants used to strip Plaintiff of his email, through which Plaintiff sent sections of his manuscript to his publisher); or, in the alternative, would have removed Plaintiff from general population. The defendants can provide no justifiable reasons as to why they blocked Plaintiff's Trulincs account. Plaintiff never abused Trulincs; never abused his phone; never abused his email by using text services in order to circumvent the system; etc. And nowhere in T. House's incident report (exhibit G) did he claim that Plaintiff did any of these things.

It was only after the defendants perceived that their latest plans of pressuring Plaintiff to act out in an aggressive manner so they could deal harshly with him; or causing him harm

by taking his and two other inmates' email privilege away from them, in the hope that the two other inmates would turn on Plaintiff in a violent manner; and/or by mentioning the amount of money that Plaintiff had in his account in the hope that it induced the other inmates to extort Plaintiff -- it was only after the defendants perceived that these latest schemes of theirs failed to produce the desired result, that they decided to add a little more pressure to Plaintiff by freezing $350.00 of his money; completely blocking his Trulincs account, and, among other things, even trashing the letters that Plaintiff mailed to his mother, which caused Plaintiff's mother to suffer much anxiety, as the letters (exhibit K) indicate.

By no means is Plaintiff the only inmate at USP Lee who has been subjected to retaliatory acts by prison officials. Recently, Plaintiff met an inmate at USP Lee who, just like Plaintiff, was retaliated against shortly after he sent Warden Streeval an email in which he complained about certain conditions at USP Lee. (See Justin James Allee v. Carjaval, et al., Case No. 7:21-cv-00084-PMS (W.D. of Vir.). In Allee's case he was subjected to a humiliating strip search in front of the entire unit by the defendants in his case, who also trashed his cell and planted a knife in his cell. In Plaintiff's case, the very next day after he sent an email to Warden Streeval with his complaint against Counselor Calton for various reasons, unit officers Hall and Welch entered into Plaintiff's cell, tore it up and made a gigantic mess in the process, and even

37

falsified an incident report in which they accused Plaintiff of possessing a heating device -- a 300 series shot that landed right in the lap of the very individual who Plaintiff complained about the day before (Calton), who sanctioned Plaintiff to one year loss of phone privilege. Plaintiff is currently trying to obtain a copy of the email he sent to Warden Streeval and the incident report that Hall issued to Plaintiff, both of which Plaintiff attached to certain miscellaneous motions that he filed in Santiago v. USA, Case No. 7:21-cv-00436-PMS (W.D. Vir.). Plaintiff will provide these to the Court as soon as he obtains them.

Defendant USP MAIL ROOM

As Exhibit A attached hereto reflects, someone in the mailroom here at USP Lee has recently refused to allow Plaintiff to have a docket sheet that he requested from the clerk of this Court. It has been Plaintiff's experience that, whenever USP Lee mailroom officials send docket sheets that Plaintiff requested from the clerk's office to his unit team members, he is never provided with an opportunity to review them. Plaintiff believes that this is simply part of a conscious attempt on the part of some unknown mailroom staff member(s), to impair Plaintiff's ability to access the Court by slowing down his efforts at preparing various legal documents, for which reason USP Lee mailroom is named as a defendant. Plaintiff does so in the hope that USP Lee mail room officials will change their policy and allow inmates, especially those

with open cases, to receive their docket sheets sent to them by the clerk of court, which are needed in order to allow inmates to keep up with the latest developments in their case; ensure that documents they mailed to the clerk were received and filed, and, in Plaintiff's case, to identify exactly which documents he wishes to order for the purpose of supporting his claims of retaliation that he suffered at the hands of USP Lee prison officials.

Another issue that Plaintiff has and wishes to resolve with mailroom staff here at USP Lee, is their policy of opening up virtually every piece of legal mail that inmates receive outside of their presence, when the mail is clearly stamped with the words: "OPEN ONLY IN THE PRESENCE OF THE INMATE". Exhibit L attached hereto consists of several pieces of legal mail that Plaintiff recently received from his attorney and from the clerk of this Court, for example -- all of which are stamped with the notice: "OPEN ONLY IN THE PRESENCE OF THE INMATE" and/or "CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATIONS"; but every last one of these letters was nevertheless opened up by USP Lee mailroom officials outside of Plaintiff's presence and delivered to him through the regular prison mail after first being photocopied.

## WARDEN STREEVAL (USP Lee)

All of the above-mentioned unlawful conduct on the part of the defendants happened, not merely on Warden Streeval's watch, but on his conscious watch. He was aware of

it all; allowed it to happen; and thus is liable. That is, he:

(a) has denied Plaintiff's daughter's mother's request to visit Plaintiff without a just cause. Once again, Plaintiff's daughter's mother has previously worked as a school bus driver and still can if she wished to do so. She has no criminal history worth mentioning. She therefore cannot possibly be a threat to the security of this institution, which strongly suggests that his decision to side with Calton's recommendation that Plaintiff's daughter's Mother's request (i.e., Denise Hoover) to visit Plaintiff be denied, was motivated by a desire to retaliate against Plaintiff.

(b) has violated all USP Lee inmates' constitutional rights by allowing his subordinates to sandblast every inmates' window in general population which, besides affecting every inmates' psychological well-being in a negative way by creating a much more gloomy environment, has also significantly reduced the amount of sunlight that is able to enter into every inmates' cell. By partially covering every inmates' outside cell window, USP Lee staff have virtually turned the entire prison into a Special Housing Unit ("hole"), where the inmates cells are covered up so they can't look out of their cell and see a little bit of peace-giving natural scenery. USP Lee is the only federal prison that Plaintiff has been to in his 20 years of imprisonment, where every cell window in general population has been blocked. Plaintiff seeks to reverse the Warden's heartless decision to strip from every inmate the joy of seeing the blue sky; the misty mountaintops; and, among

40

other things, the red glow of the sun as it rises in the morning -- not to mention stripping every inmate of the joy of relying on the incoming natural light of the sun for reading purposes at times when USP Lee is locked down (which, these days, seems to be every other week).

(c) has turned a blind eye to the obvious fact that, in ever court in USP Lee, there is a blind spot where some guards commit their most heinous acts in the form of brutal beatdowns that they inflict on certain inmates. This has no doubt been brought to the Warden's attention on numerous occasions, and the fact that no camera has been installed to capture these blind spots, demonstrates his utter disregard for the safety of inmates and his deliberately indifferent willingness to help his fellow officers cover up their misdeeds of violence against inmates.

In every court -- there's three in all -- there are four units, two on the right side of the court (one on top of the other), and two on the left side of the Court (one on top of the other). At the opening or entrance to each court is a gate that, when shut and locked, seals off the semi-retangular shaped court that the outer walls of all four units help to form. The front part of every court is covered by a camera that is fixed to the uppermost part of the right wall of the court, close to the court's entrance; but given the roughly 45° angle that it's in, it fails to include within its field of view the back part of each court where the upper unit staircases meet.

41

This could easily be solved by placing another camera on the left wall of every court and focusing it on the back part of each court. But there's a reason why this has not been done.

Recently an inmate on Plaintiff's unit was roughed up in this very spot, and when another inmate on Plaintiff's unit approached the Assistant Warden to ask him about this, according to the inmate (who Plaintiff personally spoke with), the A.W. told him that the camera didn't capture what the guards said the inmate did, so the inmate probably won't be charged. The point is, USP Lee officials in every department are aware of this blind spot; aware that many violent incidents between staff and inmates strangely happen to occur in these very blind spots; and yet no camera has been installed to cover these blind spots. Another inmate, shortly before every inmates' outside cell window was sandblasted, recently told Plaintiff that he actually witnessed several guards beating an inmate in the blind spot in the second court (where E, F, G, and H units are) while looking out of his cell window, which was situated closer to the back of the court than the front and thus provided the inmate with a perfect view of the entire beating by the guards of another inmate. Plaintiff strongly suspects that the main reason why USP Lee officials recently decided to sandblast every inmates' cell window in general population, was to prevent this very thing from happening -- i.e., to prevent any inmates from witnesses the brutal beatings that USP Lee guards often inflict on inmates at the back wall of every court. An investigation should immediately be conducted

to determine just how many incidents between inmates and USP Lee guards just so happened to have occurred in these "beat-down spots" (what USP Lee inmates call them), and cameras should immediately be installed to cover these blind spots in order to bring the guards' physical abuse of inmates to an end -- at least in these blind spots.

(d) has agreed with other defendants to freeze Plaintiff's money; place a complete block on Plaintiff's Trulincs account without a just cause, thus violating Plaintiff's First Amendment right to access the law library, among other things; and failed to remedy the problem until a magistrate judge intervened,

(e) has allowed his subordinates to lock down entire units on the false pretext of the SHU being full, if a single inmate violates a rule -- oftentimes for well over a week, during which inmates are not permitted to use the law library, enjoy an hour of recreation and exercise outside of their cells, etc.

(f) has not compelled his own officers to wear face masks for Covid, although the inmate population was forced to wear masks everywhere they went.

Etc.


CONCLUSION

For the intentional conscious scheme that defendants Streeval, Dye, Hall, Calton, Sexton, and T. House engaged in to cause Plaintiff harm, physical and psychological, Plaintiff seeks nominal, compensatory, and punitive damages, and also that the defendants be immediately terminated from their jobs and

permanently barred from ever being employed by the Bureau of Prisons again, due to the danger that they pose to the safety of inmates. Specifically, the defendants:

(1) denied Plaintiff's daughter's mother's request to visit Plaintiff without a just cause;

(2) continued taking money from Plaintiff's account for restitution that had already been paid off years earlier;

(3) planted a heating device in Plaintiff's cell and then also charged the incident as a 300 rather than as a 200 series shot, so Plaintiff would be punished more severely by defendant Calton;

(4) stripped Plaintiff of his phone privilege during a pandemic-based national emergency; and at a time when Plaintiff's 86-year old grandmother is battling cancer;

(5) issued Plaintiff two extremely petty incident reports, one of which was absolutely frivolous, and the other of which was absolutely false;

(6) charged Plaintiff with a fourth frivolous 300 series incident report for receiving/sending money in order to:

(a) use as a false pretext to strip Plaintiff of his email privilege for the purpose of hampering his ability to publish a book that was critical of them, and others;

(b) induce other inmates to extort Plaintiff;

(c) to anger other inmates in the hope that it induced them to physically harm Plaintiff;

(7) freeze Plaintiff's Trulincs account without a just cause, and:

(a) blocked Plaintiff from accessing the law library for a month, and only fixed the problem after Magistrate Judge Pamela M. Sargent intervened on Plaintiff's behalf;

(b) endangered Plaintiff by blocking his direct line of access to PREA officials;

(c) interfered unlawfully with Plaintiff's ability to fill out surveys by the Office of the Inspector General;

(d) barred Plaintiff, without a just cause, from accessing the music site, without which Plaintiff could not listen to his MP3 that he paid over $1,800.00 for, more or less;

(e) interfered with Plaintiff's ability to refill his medication;

(f) made it impossible for Plaintiff to print things out, since he could not access the "manage units" site on the computer, which thus prevented Plaintiff from printing out legal material and/or the sections of his book that he was in the process of emailing to his publisher;

(g) made it difficult for Plaintiff to make out money orders for loved ones as gifts for the holidays;

(8) froze $350.00 of Plaintiff's money, besides blocking his Trulincs account, neither of which happened to the other two individuals (Shamar Pitts and Eric Sancho) who received the exact same incident report for receiving and/or sending money without authorization (an incident report which the Regional

45

Director recently expunged, by the way);

(9) trashed the letters that Plaintiff sent out to his mother shortly after Plaintiff was stripped of his email privilege, thus forcing Plaintiff to certify his letters to his mother and publisher and daughter (the latter of which, however, never made it to its destination. (See all pages of exhibit M attached hereto, consisting of certified labels and email exchanges between Plaintiff and his mother on whether Plaintiff's daughter ever received the letter and picture he sent to her in December 15, 2021, and on a book that Plaintiff's mother bought for him for researching purposes, which mailroom officials sent back to Amazon instead of delivering it to Plaintiff);

(10) suppress and/or put up obstacles in Plaintiff's way to make it difficult for him to exhaust his administrative remedies. Exhibit N attached hereto, consisting of several related documents Plaintiff addressed and gave to his Unit Manager, illustrates the many obstacles that Calton placed in Plaintiff's way to prevent him from appealing defendant T. House's maliciously-inspired incident report against Plaintiff.

And they did all of these things, among other things, as part of a scheme to:

(a) suppress Plaintiff's First Amendment rights to:

(1) free speech;

(2) seek redress of greivance from the government;

(3) cause Plaintiff maximum mental anguish in order to, among other things:

46

(1) cause Plaintiff to act out in an aggressive manner;

(2) physically assault Plaintiff;

(3) send Plaintiff back to the SMU program, after keeping him in the Special Housing Unit (SHU) for several months;

(c) cause other inmates to extort and/or use violence against Plaintiff;

(d) prevent Plaintiff from contacting outside PREA government officials in order to report on the conditions of USP Lee, and/or to report on their unlawful actions;

(3) retaliate against Plaintiff for suing them and for seeking to make public some of the misdeeds of various BOP officers and some of the corrupt aspects of America's so-called Criminal Justice System.

Concerning defendants USP Mail Room staff, Plaintiff seeks the following:

(1) that all legal documents that inmates receive from their attorneys or from the court/clerk/prosecutor, and that are stamped: "OPEN ONLY IN THE PRESENCE OF THE INMATE," are actually opened only in the presence of the inmate -- something that one would think never should have been an issue;

(2) that inmates be allowed to have their docket sheets;

Concerning the recent act by USP Lee officials of sandblasting every cell window in general population, which darkens the cells and darkens the lives of every inmate, emotionally and psychologically, Plaintiff seeks an order directing USP Lee officials to immediately remove the

47

sandblasted windows and to reinstall clear windows to every cell so that every inmate may once again be able to see, not only the beauties of nature, but the blind spots in the back of every court where many an inmate has been brutally beaten and assaulted by USP Lee guards.

Concerning the freeze on $350.00 of Plaintiff's money, Plaintiff seeks an order directing defendants to immediately unblock his money, especially now that the Regional Director for the Mid-Atlantic Region has recently expunged the incident report on which this monetary freeze was based.

UPDATE

For the latest examples of harrassment that defendant Hall and others have recently subjected Plaintiff to, see Exhibit O attached hereto, consisting of Plaintiff's email to Warden Streeval and Captain. The first page of exhibit O consists of an email Plaintiff sent to Streeval on January 26, 2022, complaining about constant harrassment that Plaintiff was still being subjected to by officer Hall and others. Streeval's response was that Plaintiff could file a grievance with his unit team members if he wished -- the very individuals who Plaintiff intended to sue for plotting to harm Plaintiff through crafty means.

The second page of exhibit O consists of an email Plaintiff sent to Streeval on January 31, 2022, concerning a sudden change in policy that officers Hall and Bryant implemented on H unit, whereby inmates were no longer allowed to place their chairs in the day room to watch T.V. Warden Streeval's response was that the captain would address the issue.

The third page of exhibit O consists of an email Plaintiff sent to the captain asking the same question concerning officer Hall and Bryant's new vindictive rule forbidding H-unit inmates from placing their chairs out in the day room to watch T.V. The captain never responded to Plaintiff's email, presumably because he knew that what officers Hall and Bryant have done is wrong. No other officers in USP Lee have announced such a rule in/on many other unit (Plaintiff asked dozens of inmates from every unit if they were also not allowed to have

their chairs out in the dayroom, and every one of them said in essense: "No, that's only on your unit -- the guards aren't doing that on our unit." Only on H unit were inmates told, by officers Hall and Bryant, that they could no longer bring their chairs out into the dayroom to watch T.V. And there was a reason why, which brings us back to the inmate who Plaintiff previously mentioned above, i.e., his former cellmate, A. Alfadhilis (Reg. No. 51559-039), who was recently tossed into the "hole" for reporting to a USP Lee lieutenant the threat that officer Bryant recently made to him -- i.e., that he (Bryant) was going to kill him as soon as the perfect opportunity presented itself. Alfadhilis's cellmate at the time was Eric Sancho (Reg. No. 78826-054), who happens to be the same individual who received the same incident report as Plaintiff for receiving/sending money without authorization.

Because Bryant and Hall kept harrassing Alfadhilis and Sancho by entering their cell and tearing it up and threatening the former with death (these same two officers were also harrassing Plaintiff around the same time -- see exhibit O, first page), Alfadhilis and Sancho went to the lieutenant to complain about the officers in question, only to be tossed into the "hole" where they've been for the last two or three weeks (today is February 15, 2022).

A white inmate told Plaintiff that Bryant told him that he was harrassing Sancho to pressure him to get rid of Alfadhilis, but Plaintiff is convinced that there's more to the story than

this. Plaintiff has every reason to believe that Bryant and especially Hall were harrassing the entire unit in order to pressure some inmates to attack Plaintiff and Alfadhilis. For Bryant, no doubt under Hall's influence, had harrassed Plaintiff on multiple occasions around the same time. It seems to Plaintiff that, especially after Magistrate Judge Sargent intervened in Plaintiff's case several times, and after the Regional Director expunged defendant T. House's frivolous incident report against Plaintiff and restored to Plaintiff his email and complete access to Trulincs, someone or several someones in USP Lee are becoming extremely desperate to get rid of Plaintiff. During one of Bryant and Hall's recent vindictive searches of Plaintiff's cell (exhibit O, first page), for example, one of them not only ripped a leaf into tiny shreds that Plaintiff placed on his picture board before tossing it into Plaintiff's toilet, in the hope that that would trigger an explosive reaction from Plaintiff, but, as Plaintiff discovered a few days later when he decided to go through this very pro se Bivens complaint that he had been working on but had not yet finished, they even opened up the envelope that Plaintiff kept this complaint in, took out about 20 pages, and then placed the envelope back in the same spot in Plaintiff's locker where Plaintiff kept it. Lucky for Plaintiff, he had a rough copy of the same and thus simply made a copy of the missing pages and inserted them in the proper place of this complaint.[*]

[*] Plaintiff usually always makes copies of his most important documents and asks other inmates on his unit or in other units,

Officers Bryant and Hall, as just mentioned, didn't only harrass Plaintiff, Alfadhilis and Sancho. They harrassed the entire unit by, among other things, issuing their extra-judicial command to the effect that that H-unit inmates could no longer sit on their chairs while watching T.V. out in the day room (exhibit O, second and third pages), before telling certain white inmates why they were harrassing the unit -- i.e., because they wanted H-unit inmates to turn on Alfadhilis and undoubtedly Plaintiff. Now that Alfadhilis himself has recently become the victim of an attempt on the part of officers Hall and Bryant to cause him physical harm at the hands of other inmates, Plaintiff believes that he would be more inclined to provide Plaintiff with an affidavit attesting to what he heard officer Bradburn say to Plaintiff when he and Plaintiff were cellmates -- i.e., that Calton and Sexton had it in for Plaintiff, and that Plaintiff had better watch himself because they (Sexton and Calton) were coming after Plaintiff.

## Lieutenant P. Corbin

Lastly, Plaintiff wishes to add a few words concerning Lieutenant P. Corbin, who Plaintiff now strongly believes was involved in the conspiracy with others to cause Plaintiff harm, in order to preserve the right to include him as a defendant later if his inclusion as a defendant in Plaintiff's lawsuit appears to be justified. Exhibit P attached hereto consists of the entire incident report that defendant T. House issued to to hold his copies for fear of his property and legal work being trashed by prison officers, as has happened to Plaintiff in the past.

Plaintiff, which was delivered to Plaintiff by Lt. P. Corbin. P. Corbin has just recently become a lieutenant. He was previously a guard who often worked on Plaintiff's unit. While he was still a unit officer, Plaintiff remembers, he once took Plaintiff's chair and locked it inside of one of the cells in the back of the unit designated as a "SHU" cell, simply because Plaintiff didn't make it back to the unit on time to lock in (due to no fault of his own -- he was held up in education department for reasons that he can no longer remember). When Plaintiff knocked on his cell door to get then officer P. Corbin's attention in order to ask for his chair back, P. Corbin's response was: "You're fuckin' retarted for leaving the chair out!"

Exhibit P attached hereto, which Plaintiff only recently received, reveals on the third page, section 27, and in the concluding section, that Lt. T. Corbin was the one who recommended that SIS T. House's retaliatory incident report against Plaintiff and two others, be sent to the Unit Disciplinary Committee (i.e., to defendants Calton and Sexton); and that he was one of the investigators whose investigation of Plaintiff resulted in the incident report in question (which the Regional Director recently expunged) being issued to Plaintiff and two others. At this time Plaintiff leaves Lt. Corbin unnamed as a defendant, but, as this case proceeds, and depending on what other incriminating evidence may come to light in the near future, wishes to reserve the right to include him as a defendant if future developments warrant it. Evidence Plaintiff

53

recently obtained makes it even more clear that the defendants'
retaliatory actions against Plaintiff, most certainly were
motivated in large part by their malicious desire to prevent
Plaintiff from exercising his constitutional right to free
speech in the form of a book he was in the process of
publishing. Exhibit Q attached hereto¦, consisting of a recent
email exchange between Plaintiff and his publisher, Frank
Reuter, reveals that, after Plaintiff's email was stripped from
him on/around November 3, 2021 by counselor Calton based on SIS
T. House and Lt. P. Corbin's incident report against Plaintiff
for sending/receiving money, someone entered into Plaintiff
account and deleted Plaintiff's publisher from Plaintiff's
email account. In Plaintiff's publisher's response to
Plaintiff's question as to whether he (i.e., Plaintiff's
publisher) was the one who took Plaintiff off of his email list, he
stated:

> We received your letter today and just to let you know, we
> never took you off our email list. It sounds like your
> email was suspended for a time and then you had to re-
> apply with Cadmus Publishing which we responded to.

Plaintiff's publisher's suggestion that Plaintiff had to re-
apply possibly because his account was suspended cannot be
correct, because everyone else that Plaintiff had on his email
list was still there, including Plaintiff's mother. Plaintiff
did not have to re-apply with any of his other contacts except
for one -- i.e., Cadmus Publishing. What this means is that,
since Plaintiff didn't take Cadmus Publishing off of his
contact list; and since Cadmus Publishing didn't take

themselves off of Plaintiff's contact list, the defendants named in this lawsuit must have intentionally and illegally removed Cadmus Publishing from Plaintiff's email contact list, shortly after they stripped Plaintiff of his email. This is further proof of the defendants' williness to engage in extrajudicial acts despite their role as law enforcement officers. For which they are deserving of strong condemnation.

SECOND UPDATE

On June 7, 2022, because Plaintiff was experiencing some stress due to repeated unit-wide lockdowns, he asked his unit officer (i.e., officer Grace), to contact the psyche department for the reason that Plaintiff was feeling depressed. Because Ris unit's was locked down and had been locked down for several days at that point under the pretext of the Special Housing Unit being full, officer Grace cuffed Plaintiff through the slot in his door, opened up Plaintiff's cell door and then instructed Plaintiff to have a seat by the computers in the day room. Plaintiff complied. Several minutes later officers Wilson and Welch showed up on the scene -- officers who, as Plaintiff's miscellaneous motions make clear in the docket of case Santiago v. United States of America, 7:21-cv-00436-JPJ-PMS (W.D.Vir., 2021), have previously harrassed or threatened Plaintiff implicitely and explicitly on several prior occasions. At this point, officer Wilson instructed Plaintiff to stand up, bend over forward, and to walk backwards towards the back corridor in the unit. Plaintiff did as told. Once in the back corridor

55

officers Welch and Wilson escorted Plaintiff, who was still walking backwards, down several flights of stairs until we reached the corridor that enclosed the entire prison compound. Rather than turn left, which would have led us passed commissary, laundry, the cafetaria and the medical department (which way was more likely to be open to the observation of other inmates), officers Welch and Wilson directed me to turn right, which was the long way to the lieutenant's office. At first this way made some sense to Plaintiff, since this would have been the quickest route to the psychology department.[*] But what Plaintiff did not know at the time, was that he was not being led to the psychology department, but to the Lt's office.

Before we even reached the first bend, since Plaintiff was bent over foward while walking backwards; and since Plaintiff suffers from highblood pressure and heart disease for which he takes medication (Atenolol and Chlorthalidone), he explained to officers Wilson and Welch that he was beginning to feel dizzy. To which Wilson replied: "I'll have to jump on you if you fall,

---

[*] Actually, the quickest way to the Psychology department would have been to exit the unit the normal way and cut through the yard. This way would have taken half the time it took for us to reach the point where we were going, which, unknown to me at the time, was the Lt's office.

so keep going." At one point, Plaintiff remembers, he said to officers Welch and Wilson: "Is this really necessary -- I just asked to speak with a psychologist?" To which Wilson informed Plaintiff that he was instructed to walk Plaintiff in this manner.

When we finally reached the psychology department but passed it, and then passed the chapel and also passed the education department, Plaintiff began to wonder where in the world he was being taken to. But he got his answer soon enough -- the Lt.'s office. When Plaintiff entered into the Lt's office he was instructed to have a seat (either in the first room or the second room to the immediate left), which Plaintiff was more than happy to do since his heart was beating rapidly and his mouth was very dry -- the result of him being forced to walk backwards and bent over forward while officer Wilson weighed his hand on Plaintiff's back (imagine doing this while walking in a football stadium, not straight across, but around the peremeter). As Plaintiff stated in his letter to his attorney (Exhibit R of this complaint), at this point a male psychologist with white hair and probably in his late 50s or early 60s, entered into the room where I was seated and blurted out to me: "WHAT DO YOU WANT! YOU DO THIS ALL THE TIME! YOUR RECORD SHOWS IT!"

Whatever record he was referring to, it was not any record generated while Plaintiff was in USP Lee, since this was the very first time in the nearly two years that Plaintiff had been in USP Lee at that point, that he asked to speak with a

57

psychologist. Up to that point Plaintiff had not even stepped
foot inside of the psychology department a single time, or
previously asked his unit officer to call the pyschology
department during any of the many other times when Plaintiff's
unit was locked down.

To the best of Plaintiff's memory the following
conversation between himself and the chief psychologist took
place at the time in question:

Chief Psychologist: What do you want! You do this all the time.
Your record shows it!"

Plaintiff: Can I please take a break and get some water? I'm out
of breath."

C.P.: You don't need any water -- what do you want? You're not
going on suicide watch! Your're going back to your unit!"

Plaintiff: I wasn't trying to go on suicide watch. I just wanted
to talk about all the violations going on around here of
inmates' constitutional rights."

C.P. Your record shows that this is all you do -- "

Plaintiff: This is the record you guys created. There wasn't a
place in this record where I was ever asked to tell my side of
the story."
C.P. Well, we're done here!"

At this point the chief psychologist walked out of the room
and immediately Lt. Vinzant, who was standing to my left side,
grabbed me by the shoulders, put his right leg out, and tripped
me onto the floor, at which point several other officers,
including officer J. Roberts (who issued Plaintiff a falsified
incident report, as did Lt. Vinzant), attacked Plaintiff by
jumping on him and hitting him with their hands and fists on the
back of his head and the top right corner of his forehead (as he
attempted to turn his head while on the ground), and punching

him on the side of his ribs.

Roughly 30-45 seconds after Plaintiff was slammed to the ground by Lt. Vinzant and attacked by multiple officers in the Lt's office, a young female nurse or physician assistant whose named Plaintiff believes is Mrs. Pollock, entered the room and then said: "Mr. Santiago, I'm here to conduct an inmate injury assessment report. Do you have any injuries!" To which Plaintiff responded: "They're attacking me right now!" The officers who attacked me were still on top of Plaintiff when she entered, and so Plaintiff thought that he would be protected now that there was a witness. But when Mrs. Pollock coldly said: "No injuries" and then walked out of the room, Plaintiff knew at that moment that he was in serious trouble.

At this point I was lifted to my feet and told to stand against a wall, where I was stripped out and placed in panty-like underwear and a paper shirt. Plaintiff remembers that, as he was attempting to put the underwear on, the officer who was standing behind him smacked him in the back of his head real hard for failing to correctly follow his instruction of lifting one of his legs to put it through the hole of the underwear. The officer told Plaintiff to lift either his left or right leg, and Plaintiff, whose mind was thrown off a bit by what was happening to him, lifted the wrong leg. Something like that. But Plaintiff clearly remembers that hard smack across the back of his head as he was standing facing the wall during the time when he was changed into the underwear and paper shirt.

Rather than repeat everything Plaintiff already wrote in

59

his letter to his attorney, Zaki Anwar, Esq. (Exhibit R), Plaintiff respectfully refers this Court to Exhibit R of this complaint. Plaintiff will add a few details here that he failed to mention in his letter (Exhibit R). That is, that officers Hamilton and Gilmer were also present during several of two-hour restraint checks, when Lt. Hamilton and/or Lt. P. Corbin entered into the cell where Plaintiff was placed in four-point restraints. Plaintiff has recently seen officer Gilmer while going to the chow hall here at USP Lee, and recognized him as being one of those who entered the cell during several of the restraint checks. Plaintiff has no memory of officer Gilmer doing anything to him other than standing around while others (.e.g, officer Dickenson and Bradburn) tortured Plaintiff by erratically moving his leg cuffs up and down his ankle, slamming shields into Plaintiff, punching Plaintiff in his testicles, and jabbing the bottom edge of the shield into Plaintiff's ribs; but that's why he's also liable -- because he did nothing. Nothing to stop his co-workers from attacking Plaintiff and threatening him. Nor did he report their extrajudicial activities to higher authorities as he was obligated to do.

Plaintiff also has not memory of officer Hamilton doing anything to him as far as attacking him is concerned, but he, too, failed to intervene on Plaintiff's behalf and thus is also criminally liable as well as liable to be sued.

As for Nurse Pollock and P.A. Bray, the former falsified several inmate injury reports and failed to process Plaintiff's requests for X-ray examination, that he handed to her as she was

making her rounds in the SHU on the 12th and 30th of June, 2022.
And P.A. Bray also failed to process Plaintiff's request for an
X-ray that he handed to him on/around the 14th of June, 2022.
Most likely as a result of being cracked in the ribs by officer
Bradburn when Plaintiff was in four-point restraints, he began
to experience a severe pain and a drastically impaired ability
to climb on top of his bunk and get off, or, among other things,
do push ups in the days following his June 7, 2022 assault and
torture.

When Plaintiff was released from the SHU on July 28, 2022,
however, he began to seek medical attention -- specifically, an
X-ray, since he still experienced some pain in his chest even
after a few months after he was attacked (although it wasn't as
bad then as it was when Plaintiff was first attacked). And the
X-ray supports Plaintiff's claim that he suffered a fractured
rib. See Exhibit S attached to this complaint, consisting of
several electronic requests Plaintiff sent to nurse Smith
(electronically, at first, since USP Lee medical staff members
have a habit of not accurately recording what patients tell them
during their encounter) and a copy of the X-ray result,
revealing that: "Suspected callus at the anterior left fifth
rib. No acute fracture appreciated." (In Plaintiff's electronic
request, written before the X-ray was even taken, he expressed
belief that a rib "on the left side of [his] chest" was
fractured. The X-ray result is consistent with Plaintiff's
complaint. And Plaintiff has never at any point in his life ever
fractured a rib or complained about a fractured rib.)

61

At some point during Plaintiff's stay in the SHU he received noticed from the clerk that his Tort CLaim had been dismissed for failure to prosecute. (See the docket in Santiago v. United States of America, No. 22-6580 and 22-6416. Because Plaintiff had been threatened with further violence if he continued to pursue his Tort Claim, he felt compelled at that time to let his case go -- at least until he was released from the SHU and contacted his attorney and the Regional Director about what happened to him. And that is what Plaintiff did. That is, shortly after his release from the SHU on July 28, 2022; and shortly after Plaintiff wrote the letter to his attorney (Exhibit R) explaining how he was abused and tortured; and shortly after he also contacted the Regional Director by filing a Sensitive BP-9 in his office, Plaintiff filed a motion with the Fourth Circuit Court of Appeals to reopen his Tort Claim that had been dismissed. But, at first, the Court denied Plaintiff's motion to reopen up his case. At which point Plaintiff contacted the Chief Judge for the Fourth Circuit as well as ask a family member of his (i.e., Jacqueline Gutierrez) to contact the clerk and the Chief judge, in order to explain his reasons why the Court's decision to deny his motion to reopen his case was an abuse of discretion (since the only reason why Plaintiff failed to prosecute the case in question is because the defendants beat, tortured, and, among other things, threatened him with further violence if he continued to pursue his tort claim). Shortly thereafter, Plaintiff received notice from the Clerk of Court for the Fourth Circuit Court of Appeals,

62

that he would be allowed to reopen his case as long as he paid the filing fee by December 6, 2022. (See Exhibit T, consisting of an order by a Judge from the Fourth Circuit denying Plaintiff's motion to reopen his case, and also, after Plaintiff complained to the Chief Judge of the Fourth Circuit Court of Appeals, letters and a second order granting Plaintiff permission to reopen his case.)

As Exhibit R attached hereto makes it clear Mrs. Dye cancelled Plaintiff's first money order that Plaintiff made out before he was assaulted on June 7, 2022. She cancelled it the day Plaintiff was brought to the SHU on June 7, 2022, and even while he was being assaulted and tortured by the above-named defendants. (See Exhibit B of Exhibit R.) Plaintiff sent Mrs. Dye an electronic request after his release from the SHU, asking if it was her who cancelled his $505.00 money order. She declined to answer the question. But it undoubtedly was her. Plaintiff couldn't have been the one to do it, since his unit was locked down that day and he was brought to the SHU and placed in four-point restraints and tortured. In addition to everything else she did, as explained in this complaint, she did that, too. And she's still refusing to process Plaintiff's money order -- the second one he's made out recently, in compliance with the Fourth Circuit Court of Appeals order for Plaintiff to send the District Court Clerk a $505.00 money order. See Exhibit U attached hereto, consisting of electronic requests Plaintiff recently forwarded to Trust Fund Supervisor Mrs. Dye. Because USP Lee staff members are still refusing to process his money order, he intends to file, for the fourth or fifth time with the

Fourth Circuit of Appeals, a motion for an order directing USP Lee officials to deduct the filing fee of $505.00 from Plaintiff's account, and to forward that amount to the clerk of Court -- something USP Lee officials seem adamantly opposed to doing, but of which Plaintiff is absolutely determined to do.

Officers Welch and Wilson are named as defendants, not merely because they previously harrassed (Welch) and threatened (Wilson) him on multiple occasions, but also because Plaintiff believes that they were aware of the fact that Plaintiff had been assaulted in the Lt.s office on June 7, 2022, and did nothing to stop it or report the actions of their fellow officers to higher authorities. Plaintiff honestly does not remember them being in the room while Plaintiff was being attacked by Lt. Vinzant and others, but it happened not long after they walked out of the Lt's office. They most likely were still around and may have even entered the room as Plaintiff was on the ground, after he was thrown there by Lt. Vinzant. Plaintiff just does not remember, but the records and video footage may reveal this. But Plaintiff acknowledges at this point that Wilson's previous threats and officer Welch's previous harrassments may not suffice to make them liable -- unless evidence comes to light of the fact that they, too (as Plaintiff strongly believes they were), were a part of the conspiracy engaged in by many of the above-mentioned defendants, to cause Plaintiff harm. At this time Plaintiff is aware that multiple officials here at USP Lee are under investigation by the Office of Inspector General and Internal Affairs, and so

evidence may be forthcoming that sheds light on the roles that these two individuals may have played in the attack and torture, not only of Plaintiff, but also of other inmates. After all, officer Wilson himself once told Plaintiff that he was the biggest, rat bone-breaker on the compound. (See Plaintiff's miscellaneous motions that he filed in the docket, Santiago v. United States of America, No. 7:21-cv-00436-JPJ-PMS (W.D.Vir., 2021), docket nos. 12, 15, 19, 20, 23, 28, 40, 41, 44, 45, 54, 58, and 59.)

As for the chief psychologist (whose name Plaintiff does not know at this time), he is liable, since he decided to join the culture that defendants established here at USP Lee, of abuse and torture, and for denying Plaintiff and many other inmates treatment for psyche issues. Rather than treating, he indirectly participated in the beating, of inmates -- i.e., inmates such as Plaintiff who dared to ask to speak with a psychologist during a time when their units were locked down. As Exhibit R attached hereto reflects, while Plaintiff was in the SHU after he had been assaulted and tortured on June 7, 2022, he met another inmate who, just like Plaintiff, had been attacked in the Lt's office after he asked to speak with a psychologist while his unit was locked down. Pierre Jefferson is his name, and his register number is: 31379-076. And recently, only a few months after Plaintiff was released from the SHU on July 28, 2022, he met another inmate who experienced identical treatment. His unit was locked down; he experienced stress; he asked to speak with a psychologist, and he was attacked and tortured with four-

65

point restraints by multiple USP Lee staff members. His name is: Demetrice Miller (Reg. No. 22292-041). Plaintiff can't possibly be making all of this up. See his affidavit, Exhibit V attached hereto.

For the reasons that Plaintiff gave in Exhibit R of this complaint (i.e., the letter to his Jones Day attorney, Zaki Anwar, in which he elaborated on the abuse and torture he suffered on June 7, 2022), Lt. Hamilton and Lt. P. Corbin are liable. In addition to that, however, they have also made subtle and even reckless attempts to intimidate Plaintiff after his release from the SHU, once it became known to these defendants that Plaintiff's letter helped to open up an investigation into their conduct by the Office of the Inspector General and Internal Affairs. On or around September 25, 2022, for example, while Plaintiff was eating dinner, Lt. P. Corbin approached Plaintiff's table, instructed a few inmates who were sitting at Plaintiff's table to leave (since they were finished eating), and then hung around for a few very uncomfortable seconds before saying to Plaintiff: "Hey, what's up!" (As if to say: "I'm still here -- fuck you and your investigation!). Plaintiff immediately complained about this to the Justice Department, via electronic request, and also asked SIS via request to preserve the video. He did this a few other times, as well; though he never said anything else to me. He just stood by Plaintiff's table, making Plaintiff feel very uncomfortable.

Lt. Hamilton was even more brazen, however. On September 26, 2022, as Plaintiff was walking back to his unit from the chow hall during lunch time, he happened to pass by Lt. Hamilton

66

and another lieutenant with him as we all walked down the walkway -- Plaintiff, away from, and Lt. Hamilton, towards, the chow hall. As Plaintiff passed them, trying not to look their way for obvious reasons, Lt. Hamilton blurted out to Plaintiff: "HEY, I HEARD YOU CAN DRAW!" Plaintiff was walking with inmate John M. Spaulding at the time, and, after they had passed, Plaintiff explained to Spaulding what Lt. Hamilton was referring to -- i.e., the drawing that Plaintiff made in his letter to his attorney (Exhibit R, page 4), showing how Lt. Hamilton had him twisted up while he was in four-point restraints.

No sooner had Plaintiff explained to Spaulding the meaning of Lt. Hamilton's sarcastic comment, than an inmate who was walking a few yards behind us called out to Plaintiff who he knows (since he and Plaintiff are on the same unit). When Plaintiff and Spaulding turned around, the inmate who called out to Plaintiff (i.e., Keith Ivy), who himself was leaving the chow hall, approached Plaintiff and explained to him that, as he was passing by Lt. Hamilton, not long after Plaintiff and Spaulding passed him, he overheard Lt. Hamilton say to the other lieutenant he was walking with: "I'm going to get that tall mother fucker again!" Immediately, Plaintiff asked both Keith Ivy and Spaulding to provide him with affidavits, declaring under penalty of perjury what they had witnessed and heard. (See Exhibit W attached hereto, consisting of the affidavits of John M. Spaulding and Keith Ivy.) And in addition to this Plaintiff immediately forwarded two electronic emails -- one, to the Justice Department to complain about Lt. Hamilton's behavior,

67

which was obviously designed to intimidate Plaintiff and obstruct justice, since he was no doubt aware at that time that an investigation was being conducted by the Office of Inspector General and Internal Affairs into his unlawful activities, among others; and, two, to SIS of USP Lee with a request to preserve the video showing the entire scene playing out. Plaintiff couldn't have possibly staged the scene in question. Keith Ivy himself, by the way, had previously been subjected to Lt. Hamilton's wrath long before Plaintiff had while he himself was in the SHU in April of 2022. (See Exhibit X attached hereto, consisting of Keith Ivy's Affidavit.) Immediately after Keith Ivy was released from the SHU he contacted his sister to explain to her what happened to him -- that is, how he was beaten and tortured by Lt. Hamilton and others simply for daring to ask for medical attention, and, after his sister had called up the Warden to complain, SIS J. Canfield called Keith Ivy to the Lt's office for purposes of conducting another one of his biased internal investigations, which never resulted in any action being taken designed to deter his fellow officers from engaging in such brutal and extrajudicial activities. Plaintiff remembers when Keith Ivy was released from the SHU. He approached Plaintiff and, with an earnest look in his eyes, said to Plaintiff: "Marcos, they did me dirty down in the SHU..." Plaintiff listened to what Keith Ivy had to say, but no one who hasn't experienced the abuse themselves could fully understand. And at that point Plaintiff himself had not experienced the abuse and torture of the defendants. But on June 7, 2022 he did experience it first hand.

As for Warden J.C. Streeval, he's liable since, not only is he the Warden of USP Lee, but he himself has played a role in setting inmates up for complaints. Inmate Justin J. Allee, for example, just as Plaintiff had done, forwarded an electronic request to Warden Streeval to bring certain abuses to his attention, and not long after a goon squad showed up to Allee's unit to harrass him. (See Exhibit Y attached hereto, consisting of Allee's sworn affidavit.) In the Bivens action lawsuit that Allee filed in this Court against various USP Lee officers, including Bradburn who Plaintiff named as a defendant in his own Bivens action, Allee mentioned how, at one point while he was in the SHU for a knife that was planted in his cell in retaliation for his complaints and filed grievances, none other than Warden J.C. Streeval himself showed up outside of his door and said to Allee: "See, I told you we'll take care of your incident report free record if you continued complaining!..." Allee was trying to get transferred to a lower security institution, but that dream went out the window when officers planted two knives in his cell, back to back. See Justin J. Allee v. Carjaval, et al, Case No. 7:21-cv-00084 and Case No. 7:21-cv-00088-PMS. Like the Warden in Dublin, a female prison in California, Warden J.C. Streeval together with his Captain, Mr. Bowles, has carried on in this institution as if he was above the law and was untouchable like John Gotti. Many tyrants in the past have thought the same thing, and they, too, were proved wrong and rebuked for their arrogance and wrongful actions.

69

Inmate Jon Giles is another inmate who has been subjected to the cruel and unusual treatment of USP Lee officials, including by officer Ewing, who Plaintiff has named as a defendant herein. As Jon Giles affidavit attached hereto as Exhibit Z makes clear, while he himself was in the SHU, he not only witnessed Plaintiff ask Nurse/Physician Assistant Pollock (name may be mispelled) and PA Bray for medical attention in the form of an X-ray (since he was right across from Plaintiff on D range, where Plaintiff was placed until he saw the DHO on June 15, 2022 and was removed to B range), but he himself has experienced being threatened with violence if he said that he had any injuries while the camera was rolling. As Lt. Hamilton did to Plaintiff, officer Ewing did to Jon Giles, shortly before a physician assistant asked him while the camera was on if he had any injuries. His answer, as Plaintiff's answer, was: "No injuries." To say anything else would have resulted in a beat down. (See Exhibit Z, consisting of Jon Giles sworn affidavit.)

As Plaintiff mentioned in his letter to his attorney (Exhibit R), he witnessed other inmates being tortured also while he was on B range, including Dana Johnson, who Plaintiff witnessed being water-boarded. Plaintiff also received an affidavit from him, but, because Dana Johnson's family have recently hired him an attorney, Plaintiff will allow Dana's attorney to represent his client as he sees fit. However, this Court will shortly be hearing from Dana Johnson, as well. And Plaintiff is a major witness of the fact that Dana Johnson was tortured, among others.

70

In closing Plaintiff accuses Defendant Lt. P. Corbin of one more thing, besides all of his other violations of federal law as mentioned above, particularly expressed in Exhibit R attached hereto (i.e., Plaintiff's letter to his attorney, Zaki Anwar, in which he detailed all of the abuse that he was subjected to by Lt. P. Corbin, among others.) Not long after Plaintiff mailed the letter in question (Exhibit R) to his attorney, he received a letter from his attorney informing him that, as he had only been appointed to represent Plaintiff on his Rehaif issue, there was nothing he could do. Plaintiff then wrote a letter to his attorney asking him to send a copy of the letter to his sister, Jacqueline Gutierrez. And in the meantime Plaintiff asked his sister to contact Plaintiff's attorney and to ask him to send a copy. Initially, there was some confusion over permission to release information to third parties that Plaintiff's attorney requested of Plaintiff, so Plaintiff decided to send two copies of his 13-page letter with exhibits (Exhibit R) to both his sister, Jacqueline and his mother Teresa. The letter that Plaintiff sent to his sister was certified, but, because Plaintiff's unit was locked down at the time that he was in the process of sending his mother a copy of the letter, he decided to send it out through the regular mail on his unit. The unit officer was Cook at the time, and as Plaintiff felt comfortable with officer Cook, since he was pretty cool and laid back individual, never harrassing anyone, he made this decision to send out the letter via regular mail

71

by placing the letter in the unit mailbox. Because Plaintiff's
unit was locked down, however (as Plaintiff already mentioned),
he asked the orderly (the only one allowed out of the cell
during unit lockdowns, since someone has to clean up the
showers and unit, and help pass laundry out, among other
things) to please bring his mail (a large brown envelope with
the letter in it) to the guard's office. And he did, after
Plaintiff slid the mail to him under the cell door. The
orderly's nickname was "Five", but Plaintiff recently learned
that his name is James Harris. And the day in question was
on or around September 4, 2022 (Sunday). Anyway, about 4 an
hour later, inmates James Harris showed up outside of
Plaintiff's door and said: "Man, whatchu had in that envelope
-- they're all in there right now with your paper work all
spread on the desk, reading your stuff!" Plaintiff asked him
who it was who was reading over his letter, and inmate Harris's
answer was: "[Officer] Cook and [Lt. P.] Corbin." Plaintiff
then asked: "Lt. Corbin?" "Yeah," was James Harris's answer.
Immediately, Plaintiff said to himself: "That mail is not going
to make it out." And Plaintiff was right. His sister,
Jacqueline Guiterrez, received the copy that he sent to her via
certified mail, which he mailed out through the legal mailroom
department. But the copy of the letter that Plaintiff sent out
through the regular mail box on his unit, never made it to his
mother. In support of this claim, Plaintiff submits the last
exhibit of this complaint -- i.e., Exhibit Omega, consisting of
two letters that Plaintiff received from his sister, Jacqueline

72

Gutierrez, and from his mother, Teresa Dejesus. In Plaintiff's

sister's letter, dated 9/17/22, she wrote:

> Hey Mike [Plaintiff's nickname]:
>
> - Hope all is well. I'm okay. Everybody here is good.
>   Spoke to Patricia yesterday [i.e., the Clerk of the
>   Fourth Circuit Court of Appeals]. She said she
>   received your letter. Motion was denied to reopen
>   case. Apparently she sent mail out on this September
>   7th.
>
> Put me on visit list so that Griselle [the mother of
> one of the inmates who Plaintiff witnessed being tortured in
> the SHU, from about July 5 to July 7, 2022, by
> multiple USP Lee officers (See Exhibit R). She did
> come up with Plaintiff's sister to visit him
> recently, but she was informed that inmates in the
> SHU are no longer allowed to have visits] and I can
> visit. Mom [i.e., Teresa Dejesus] called yesterday.
> She told me that she never received a certified
> letter from you [a mistake, since Plaintiff never
> told either his sister or his mother that he sent
> the letter to his mother through certified mail]. I
> received mine. It's best that she doesn't because
> she stresses. Take care Mike. Love Jackie.

And in Plaintiff's mother's letter, dated September 27, 2022,

she wrote:

> Hi my son Mayco [a strange way that Plaintiff's
> mother always spelled Plaintiff's nickname, Mike or
> Michael]? How are you? I hope you are doing ok. I'm
> ok, 2 weeks without light [she lives in Puerto Rico
> and experienced a hurricane-induced electrical black
> out], but I'm used to it already. Mayco I did not
> receive your letter. I know a little of what happen
> to you not all. Jackie said is better for me not to
> read the letter of what happen to you.
>
> Anyway I hope new things come out soon. Mayco I have
> the money to get the generator 2 things happen I
> don't know how to deal with that, and I don't know
> if I being moving to USA again. I don't want to go
> back but if I have too then I will. I gave the
> information about the judge and the attorney that
> you told me to call, Judge denied whatever you send
> to reopen your case and the lawyer does not have
> whatever you ask me yet. Well anything get in touch.
> I love you and God Bless you and God always have a
> purpose for everything. Take care of yourself. Love
> you always. God Bless you.

Plaintiff's sister and mother's letters make it clear that, Plaintiff's mother never received the copy of his 13-page letter with exhibits, in which Plaintiff incriminated Lt. P. Corbin in a crime, among other USP Lee officials. And, in addition to all of the other crimes that Lt. P. Corbin committed (i.e., directing the officers under him to torture Plaintiff while he was in four-point and especially in ambulatory restraints; threatening Plaintiff with further violence if he did not stop filing grievances and if he didn't give up his Tort Claim; and, among other things, no doubt playing a role in the cancelling of Plaintiff's money order around the very time that Plaintiff was being tortured (See Exhibit R)), he even went so far in his willingness to cover up his crimes, as to trash Plaintiff's letter that he was trying to send to his mother so that someone in his family knew what happened to him. Remember, Plaintiff was released from the SHU on July 28, 2022, and immediately prepared the letter to his attorney. It took a few days since Plaintiff's unit had been locked down on several occasions around the time in question. So, although the letter is dated July 29, 2022 (the day following his release from the SHU), it wasn't until about August 1, 2022 that Plaintiff finally finished typing up the letter, and wasn't until a few days after that when he was able to mail it out to his attorney via certified mail/legal mail department.

And it wasn't until roughly two weeks later (approximately August 15, 2022) when Plaintiff received a

74

letter back from his attorney, informing him that there was nothing that he could do to help Plaintiff, since he was only appointed to represent Plaintiff on his Rehaif issue. From that moment on Plaintiff decided that it was important for his family to at least know what happened, so he wrote his attorney back asking him to please send a copy of Plaintiff's letter (Exhibit R) to his sister Jacqueline Gutierrez. But there was some initial confusion over release of information issues, so it wasn't until about early September when Plaintiff's sister, Jacqueline Gutierrez, received two copies of the letter in question -- one from Plaintiff and one from Plaintiff's attorney. But it took a week or two before Plaintiff finally learned that his sister had received the letter. So, besides sending Plaintiff's sister a copy of the letter, Plaintiff also decided to send his mother a copy, because, as previously mentioned, at that time he deemed it extremely important for someone in his family to know what happened to him. Especially since many of the officers who attacked him were still working in the institution, and, unfortunately, several of them still are working in this institution even at this date of November 22, 2022 -- roughly six months after they attacked and tortured Plaintiff on June 7, 2022. A recent report by the Office of Inspector General addressed to the BOP director explains why -- i.e., because the testimony and statements of inmates, when it comes to complaints against staff, are hardly ever considered or given any weight. Sadly, had Plaintiff done to the defendants what they did to him,

75

justice would have been served on Plaintiff swiftly and without any delay at all. The Court would have been quick to say to Plaintiff: "SHAME ON YOU!"; society would have been quick to find Plaintiff: "GUILTY!" And the court would have been happy to sentence Plaintiff to decades more in prison. But when it's prison officials who commit the crimes, everyone seems to turn a blind eye. It is Plaintiff's prayer that this double standard; this "one law for them; and one law for us" corrupted form of justice or injustice that currently plagues America's criminal justice system -- it is Plaintiff's prayer that this injustice come to an end, and that the defendants be held accountable for their horrendous crimes against humanity and crimes against the laws of the United States of America.

Lastly, as for Captain Bowles, not only did I personally witness him participating in the torture of inmate Galindo Serrano while he was in four-point restraints from July 5, 2022 to July 7, 2022, but Plaintiff knows of at least two other inmates, including Demetrius Miller, who were beaten by USP Lee officers after Captain Bowles himself, in their presence, ordered his officers to attack the inmates. In this insane environment that currently exists here at USP Lee -- a reign of terror --, Captain Bowles, among others, is the chief architect of the abuse. (See page 8 of Exhibit R attached hereto.) Inmates here at USP Lee are intimidated and afraid to speak up -- many of them, that is. But Plaintiff did obtain an affidavit from Demetrius Miller, in which, among other things, he implicated Captain Bowles in the crimes of ordering his underlings to attack him simply for asking to speak with a psychologist -- the

76

same exact thing that happened to Plaintiff when he asked to speak to a psychologist, on June 7, 2022. To be clear, on that day, Captain Bowles was not present when Plaintiff was attacked in the lieutenant's office, among other things. But it's the environment that Captain Bowles is helping to create in USP Lee -- i.e., an environment of beatings, fear, intimidations, retaliations, racism, intolerance, etc. -- that enabled the officers who attacked Plaintiff and tortured him, to do what they did with impunity. (See Exhibit V attached hereto, consisting of Demetrius Miller's affidavit implicating Captain Bowles in crimes.)

May this Honorable Court hold the defendants accountable for their actions.

Respectfully submitted,

Marcos F. Santiago

Under penalty of perjury, I, Marcos F. Santiago, declare that the foregoing is true and correct to the best of my knowledge and ability.

Marcos F. Santiago

PS: On January 17, 2023, Defendant Lt. Hamilton attempted to harrass the Plaintiff again. See Plaintiff's affidavit behind John Spaulding and Keith Ivy's affidavits in Exhibit W attached hereto.

CERTIFIED MAIL®

7020 0640 0000 9500 3844

Marcos F. Santiago
55363-066
USP Lee
PO Box 305
Jonesville, VA 24263

ID'd
By
DC

Office of The clerk
U.S. District Court
210 Franklin Rd
Room 540
Roanoke, VA 24011

Legal mail