**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | |
|---|---|
| MARCOS F. SANTIAGO,<br><br>                                        *Plaintiff*,<br><br>v.<br><br>J.C. STREEVAL, et al.,<br><br>                                        *Defendants*. | Case No. 7:23-cv-00064-RSB-PMS<br><br>Magistrate Judge Pamela Meade Sargent<br><br><br>**JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT[1]**

Plaintiff Marcus Santiago ("Plaintiff" or "Mr. Santiago"), through undersigned counsel, files this Amended Complaint against Defendants Merrick Garland, Colette Peters, Christopher Gomez, Warden J.C. Streeval, Captain Officer James Bowles, Lt. Vinzant, Lt. Chad Hamilton, Lt. P. Corbin, Officer B. Calton, Officer Michael Ewing, Officer Dickenson, Officer Jacob Roberts, Officer Rick Bradburn, Officer Gilmer, Officer Will Hamilton, Officer Welch, Officer Wilson, Chief Psychologist Dr. Justin Phelps, Medical P.A. Bray, Medical R.N. Maryellen Pauley; and Doe Defendant 1, Doe Defendant 2, Doe Defendant 3, Doe Defendant 4, and Doe Defendant 5 (collectively, the "Defendants").

**NATURE OF ACTION**

1.      "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted).  Moreover, under the Eighth Amendment, prisoners must have "the minimal

---

[1] On January 27, 2023, Plaintiff Marcos F. Santiago filed his original complaint in this matter.  *See Santiago v. Streeval et al.*, No. 7:23-cv-00064 (W.D. Va. Jan. 27, 2023), ECF No. 1.

civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), including "basic human needs," such as food, sanitation, and medical care. *Id.*

2.      Mr. Santiago, a prisoner in the United States Penitentiary at Lee ("USP Lee") at the time the original Complaint was filed, is among the hundreds of residents who have been routinely subjected to unwarranted and excessive physical assaults, racial discrimination, and depravation of basic human needs in violation of the United States Constitution.  Mr. Santiago's tormentors are the Warden, guards, and other staff at USP Lee who are charged with protecting Mr. Santiago's rights, ensuring his safety, and providing for his basic human needs.  These Defendants intentionally betray, spectacularly, these basic obligations to Mr. Santiago and the other residents at USP Lee.  At USP Lee, residents are not only serving time, they are also being physically and mentally destroyed by the individuals tasked with carrying out their sentences.

3.      Mr. Santiago is not naïve—a multi-decade sentence in a federal penitentiary for a violent crime is no vacation, and he understands that his civil rights are subject to constraints that do not exist outside of a penitentiary.  But certain fundamental constitutional rights remain, even for a convicted felon such as Mr. Santiago.  And a torture chamber sanctioned by the federal government in which Defendants assault residents like Mr. Santiago to the point of near death; a prison administration in which almost-exclusively-white guards discriminate against and commit violent criminal acts disproportionately against persons of color; a prison in which the Defendants enlist and threaten residents to "put in work" by committing violent physical acts against other residents; a prison staff that dehumanizes residents by parading them nearly nude through the facility while mocking their race and genitalia (and in some instances sexually assaulting residents along the way); depriving residents of food, sanitary living conditions, and basic medical care; and employing violence and restraints for periods lasting several days in

contravention of codified prison policies—none of this comes even close to meeting the lowest possible standards for resident care at a federal penitentiary.

4.     To make matters worse, the Defendants have engaged in a coordinated effort to silence complaints by residents, such as Mr. Santiago, by depriving them of their limited redress for these egregiously horrifying conditions.  Defendants do so by withholding the forms residents use to lodge grievances for misconduct by prison staff and refusing to submit completed grievance forms in the required timeframes. Defendants go as far as intimidating and retaliating against residents, like Mr. Santiago, who pursue legitimate grievances against prison staff for abuse, including by isolating prisoners in the Special Housing Unit ("SHU") without justification or based on false premises; interfering with communications between prisoners and their counsel, including illegally listening to attorney-client privileged phone conversations and; opening and reading clearly marked privileged legal mail communications. Prisoners who dare to speak out against staff abuse are moved to other facilities.  As a practical matter, the limited rights prisoners have to pursue lawsuits for abuse pursuant to the Prison Litigation Reform Act are systematically thwarted by the administration at USP Lee through the means described above.  As a result, it is virtually impossible for a resident who has suffered abuse, such as Mr. Santiago, to navigate a complex multi-step grievance process in order to exhaust his administrative remedies under 42 U.S.C. § 1997e(a) and then bring a civil lawsuit.

## JURISDICTION

5.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Mr. Santiago's claims present federal questions regarding rights arising under the United States Constitution.

## VENUE

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because the acts

or omissions that give rise to Plaintiff's claims occurred, in whole or in part, in Pennington Gap, Virginia, in the Western District of Virginia.

## PARTIES

A.    Plaintiff.

7.    At all times relevant to this Complaint, Plaintiff Marcos Santiago was a resident at USP Lee.  Prior to his conviction, Mr. Santiago resided in and was a citizen of the State of New York.  On or around March 2023, Plaintiff was transferred from USP Lee to USP Victorville in Victorville, California where he currently lives.

B.    Defendants.[2]

8.    Defendant Merrick Garland ("Garland" or "Defendant Garland") is the Attorney General of the United States.  The Attorney General is the head of the United States Department of Justice, which includes the Bureau of Prisons.  Defendant Garland is being sued in his official capacity.

9.    Defendant Colette Peters ("Peters" or "Defendant Peters") is the Director of the Bureau of Prisons ("BOP").  The Director is responsible for the operation of 122 BOP facilities, including USP Lee, six regional offices, two staff training centers, and 22 residential reentry management field offices.  She is also responsible for the oversight and management of approximately 35,000 staff and 160,000 incarcerated individuals.  Defendant Peters is being sued in her official capacity.

10.    Defendant Christopher Gomez ("Gomez" or "Defendant Gomez") is the Regional Director of the Mid-Atlantic Region for the BOP, which includes USP Lee.  The Regional

---

[2] Defendants Bowles, Bradburn, Bray, Corbin, Dickenson, Gilmer, Hall, C. Hamilton, W. Hamilton, Pauley, Streeval, Vinzant, Welch, and Wilson either actively participated in Plaintiff's torture, condoned the use of the force, failed to intervene to prevent injury and harm to Plaintiff, and/or failed to treat Plaintiff's injuries described further below.  These Defendants, together with other correctional officers whose identities are as yet unknown to Mr. Santiago, are collectively referred to as the "SHU Defendants."

Director oversees the operation of 21 BOP facilities, including USP Lee.  He is responsible for the oversight and the management of more than 6,200 employees and the custody and care of approximately 27,000 incarcerated individuals.  Defendant Gomez is being sued in his official capacity.

11.     Defendant J.C. Streeval ("Warden Streeval")[3] is the Warden of USP Lee.  He is responsible for overseeing the operations at USP Lee, including resident housing decisions, the use of force, and the use of restraints.  He is sued here in both his official and his individual capacity.  Upon information and belief, Warden Streeval resides and works in the Commonwealth of Virginia.

12.     Defendant James Bowles ("Bowles" or "Defendant Bowles")[4] is a Lieutenant officer and/or Captain at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Bowles resides and works in the Commonwealth of Virginia.

13.     Defendant Vinzant ("Vinzant" or "Defendant Vinzant")[5] is a Lieutenant officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Vinzant resides and works in the Commonwealth of Virginia.

---

[3] Warden Streeval arrived at USP Lee in 2020.  Since then, he has been named as a defendant in eighteen other actions in the U.S. District Court for the Western District of Virginia.  In these actions, plaintiffs allege Warden Streeval has engaged in acts, through his work at USP Lee, relating to:  failure to protect residents, torture, assault, sexual harassment, unreasonable searches and seizures, violations of due process rights, violations of equal protection rights, derelictions of duty, negligence leading to assault and death, deliberate indifference to prisoners' lives, retaliation against prisoners, abuse of power and authority, failure to follow CDC guidelines, cruel and unusual punishment, reckless disregard for life, provision of unlawful living conditions, denial of medical treatment to prisoners, unlawful imprisonment, denial of prisoner access to legal materials, mail tampering, retaliatory excessive force, falsifying official prison reports, excessive force, failing to provide access to legal remedies, and entrapment.

[4] Bowles has been named as a defendant in four other actions in the U.S. District Court for the Western District of Virginia.  In these actions, Bowles is alleged, through his work at USP Lee, to have engaged in:  torture, failure to protect residents, assault, neglect, dereliction of duty, sexual harassment, and threatening bodily harm.

[5] Vinzant has been named as a defendant in two other actions in the U.S. District Court for the Western District of Virginia.  In these actions, Vinzant is alleged, through his work at USP Lee, to have engaged in:  assault, sexual harassment, unreasonable searches and seizures, due process violations, equal protection violations, falsifying official prison reports, and torture.

14.      Defendant Chad Hamilton ("Chad Hamilton" or "Defendant Chad Hamilton")[6] is a Lieutenant officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Chad Hamilton resides and works in the Commonwealth of Virginia.

15.      Defendant Corbin ("Corbin" or "Defendant Corbin")[7] is a Lieutenant officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Corbin resides and works in the Commonwealth of Virginia.

16.      Defendant B. Calton ("Calton" or "Defendant Calton")[8] is an officer and counselor at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Calton resides and works in the Commonwealth of Virginia.

17.      Defendant Michael Ewing ("Ewing" or "Defendant Ewing")[9] is an officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Ewing resides and works in the Commonwealth of Virginia.

---

[6] Chad Hamilton has been named as a defendant in ten other actions in the U.S. District Court for the Western District of Virginia.  In these actions, plaintiffs allege Chad Hamilton, through his work at USP Lee, is responsible for acts relating to:  assault, sexual harassment, unreasonable searches and seizures, due process violations, equal protection violations, denial of medical treatment, use of excessive force, torture, failure to protect residents, provision of unlawful living conditions, denial of medical treatment, unlawful imprisonment, deprivation of rights, falsifying medical records, denying prisoners access to legal materials, mail tampering, retaliatory excessive force, deliberate indifference to prisoners' safety, retaliation, interfering with access to legal remedies, and cruel and unusual punishment.

[7] Corbin has been named as a defendant in three other actions in the U.S. District Court for the Western District of Virginia.  In these actions, plaintiffs allege Corbin, through his work at USP Lee, is responsible for acts relating to: assault, sexual harassment, unreasonable searches and seizures, violations of due process rights, violations of equal protection rights, falsifying official prison reports, torture, denial of medical care, and deliberate indifference to the right to protection and personal safety.

[8] Calton has been named as a defendant in four other actions in the U.S. District Court for the Western District of Virginia.  In these actions, plaintiffs allege Officer Calton, through his work at USP Lee, has engaged in acts by which prisoners have been deprived of the grievance process, torture, excessive force, cruel and unusual punishment, negligence/failure to protect residents, and reckless disregard for life.

[9] Ewing has been named as a defendant in five other actions in the U.S. District Court for the Western District of Virginia.  In these actions, plaintiffs allege Ewing, through his work at USP Lee, has engaged in acts relating to: assault, sexual harassment, unreasonable searches and seizures, violations of due process rights, violations of equal protection rights, torture, deliberate indifference to protection and personal safety, denial of medical treatment, denial of access to legal materials, mail tampering, retaliatory excessive force, retaliation, unlawful imprisonment, and furnishing improper living conditions.

18.    Defendant Dickenson ("Dickenson" or "Defendant Dickenson")[10] is an officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Dickenson resides and works in the Commonwealth of Virginia.

19.    Defendant Rick Bradburn ("Bradburn" or "Defendant Bradburn")[11] is an officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Bradburn resides and works in the Commonwealth of Virginia.

20.    Defendant Jacob Roberts ("Roberts" or "Defendant Roberts") is an officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Roberts resides and works in the Commonwealth of Virginia.

21.    Defendant Gilmer ("Gilmer" or "Defendant Gilmer") is an officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Gilmer resides and works in the Commonwealth of Virginia.

22.    Defendant Will Hamilton ("Will Hamilton" or "Defendant Will Hamilton")[12] is an officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Will Hamilton resides and works in the Commonwealth of Virginia.

---

[10] Dickenson has been named as a defendant in four other actions in the U.S. District Court for the Western District of Virginia.  Within these actions, plaintiffs allege Dickenson has engaged in acts relating to:  assault, sexual harassment, unreasonable searches and seizures, due process violations, equal protection violations, cruel and unusual punishment, false imprisonment, perjury under oath, subordination of perjury, falsifying official prison reports, excessive force, denial of access to legal materials, mail tampering, retaliatory excessive force, torture, hate crimes, discrimination, and restricting access to legal remedies.

[11] Bradburn has been named as a defendant in five other actions in the U.S. District Court for the Western District of Virginia.  In these actions, plaintiffs allege Bradburn has engaged in acts relating to:  assault, sexual harassment, unreasonable searches and seizures, violations of due process, violations of equal protection, medical neglect, torture, failure to protect residents, and falsifying official police reports.

[12] Hamilton has been named as a defendant in ten other actions in the U.S. District Court for the Western District of Virginia.  In these actions, plaintiffs allege Officer Hamilton has engaged in acts relating to:  assault, sexual harassment, unreasonable searches and seizures, violations of due process, violations of equal protection, denial of medical treatment, use of excessive force, torture, failure to protect residents, provision of unlawful living conditions, unlawful imprisonment, deprivation of rights, falsifying medical records, denying access to legal materials, mail tampering, retaliatory excessive force, deliberate indifference to prisoners' safety, deprivation of access to legal remedies, and cruel and unusual punishment.

23.     Defendant Welch ("Welch" or "Defendant Welch")[13] is an officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Welch resides and works in the Commonwealth of Virginia.

24.     Defendant Wilson ("Wilson" or "Defendant Wilson")[14] is an officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Wilson resides and works in the Commonwealth of Virginia.

25.     Upon information and belief, Defendant Dr. Justin Phelps ("Phelps" or "Defendant Phelps") was the Chief Psychologist at USP Lee at the time of Mr. Santiago's injuries.  He is sued here in his individual capacity.  Upon information and belief, Phelps resides and works in the Commonwealth of Virginia.

26.     Defendant Bray ("Bray" or "Defendant Bray")[15] is a medical officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Bray resides and works in the Commonwealth of Virginia.

27.     Defendant Maryellen Pauley ("Pauley" or "Defendant Pauley") was a medical officer and Registered Nurse at USP Lee at the time of Mr. Santiago's injuries.  She is sued here in her individual capacity.  Upon information and belief, Pauley resides and works in the Commonwealth of Virginia.

28.     Doe Defendants 1–5 are USP Lee employees who worked in the SHU at the time

---

[13] Welch has been named as a defendant in one other action in the U.S. District Court for the Western District of Virginia.  In this action, plaintiff alleges Officer Welch has engaged in acts involving cruel and unusual punishment, negligence/failure to protect residents, and reckless disregard for life.

[14] Wilson has been named as a defendant in three other actions in the U.S. District Court for the Western District of Virginia.  In these actions, plaintiffs allege Wilson has engaged in acts relating to:  assault, sexual harassment, unreasonable searches and seizures, violations of due process rights, violations of equal protection rights, cruel and unusual punishment, denial of access to legal remedies, negligence/failure to protect residents, and reckless disregard for life.

[15] Bray has been named as a defendant in one other action in the U.S. District Court for the Western District of Virginia.  In this action, plaintiff alleges Bray has engaged in acts relating to:  provision of unlawful living conditions, medical neglect, and unlawful imprisonment.

of Mr. Santiago's injuries (hereinafter "Unknown SHU Defendants").  They are each sued in

their individual capacity.  The Unknown SHU Defendants work in the Commonwealth of

Virginia at USP Lee.

**FACTS**

29.    USP Lee is a federal penitentiary located in Pennington Gap, Virginia.

30.    USP Lee is a high-security facility that houses approximately 1,500 adult males

who are high security offenders.[16]  USP Lee has twelve housing units located in three buildings.

Each housing unit can house 128 offenders.[17]

31.    USP Lee has one SHU.  The purported purpose of the SHU is to 1) house

residents in disciplinary segregation as a result of a formal disciplinary finding; 2) house

residents on administrative detention pending transfer or investigation of a disciplinary

infraction; and 3) house residents in protective custody.[18]

32.    In reality, the SHU, which is routinely kept at full capacity by USP Lee's

administration, is used as a venue for extreme abuse and retaliation against residents by prison

staff.  Indeed, individuals housed in the SHU often hear the screams of other residents as they are

tortured by prison staff around the clock, typically within the two holding cells located in the

SHU.  These holding cells do not have toilets, and individuals who are abused in those cells,

often over the course of consecutive days, are forced to defecate and urinate on themselves.

33.    The prison staff, including the Defendants, strategically conceal their abuse, and

will often place toilet paper over the cameras in the SHU holding cells, which do not capture

---

[16] Charles Thronton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council (Sept. 6, 2019),
https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%2
0FINAL%20with%20BOP%20response%209-6-19.pdf.
[17] *USP Lee*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/lee/.
[18] *Program Statement on Special Housing Units*, Federal Bureau of Prisons at 3–6; 9 (Nov. 23, 2016),
https://www.bop.gov/policy/progstat/5270.11.pdf.

sound, to prevent their actions from being recorded.  In other instances, residents are taken by prison staff to blind spots in the SHU and passages leading to and from it, where cameras cannot record the abuse that occurs.  In still other instances, prison staff will threaten an individual to violently attack his cellmate within their own cell, where cameras are also not located.

34.     To further conceal the abuse of prisoners, residents are forced, under the threat of additional violence, to state in a video recording captured by medical personnel that they do not have any injuries.

35.     The SHU contains a medical examination room that is rarely, if ever, used to conduct actual medical evaluations.  The medical staff tasked with providing care in the SHU, including mental health professionals, are deliberately indifferent to the abuse and torture that takes place, and the severe injuries that result.  USP Lee medical staff are often complicit in the efforts of other prison staff to conceal injuries by ignoring injuries to prisoners and/or by falsifying medical reports.  Indeed, medical staff, including Defendant Pauley, was present in the cell while Mr. Santiago was being repeatedly kicked and punched by prison staff, but nevertheless reported that Mr. Santiago had suffered no injuries.

36.     The conditions of confinement in the SHU are inhumane.  Individuals are not provided proper or clean clothing and are sometimes forced by prison staff to wear paper gowns that expose their genitalia—leading to sexually and racially abusive commentary by prison staff. When prisoners are given SHU uniforms, they are often forced to wear the same tattered, dirty clothing for several days in a row.  Individuals are given a total of 10–12 squares of toilet paper per day.  The toilets malfunction regularly, and individuals are forced to leave their feces in towels until maintenance staff arrives, which sometimes takes several days.  Individuals are forced to eat bologna sandwiches after prison staff smear them across a dirty floor.  In some

10

cases, food is withheld from prisoners altogether for days on end.  Recreation time is inconsistent and generally nonexistent.  Windows in the SHU are sandblasted which prevents any natural light from entering cells, leaving residents to receive small slivers of sunlight through tiny cracks in the sandblast.

37.    Access to the law library in the SHU is non-existent due to prison staff routinely reporting that the law library computers are broken or inaccessible.

38.    Prisoners suffering from these horrible conditions and treatment are given only limited access to grievance forms to lodge complaints against USP Lee staff.  Defendant Calton will not only refuse to give the grievance forms to individuals who request them, but when he does, will also at times provide the wrong form, and/or fail to transmit completed grievance forms to the appropriate personnel in the required timeframes.

39.    Although the SHU is generally reserved for individuals who either pose a threat to other residents, staff, or are at risk of harm, Defendant Chad Hamilton, Defendant Vinzant, and Defendant Roberts confine individuals in the SHU for no legitimate reason.  Residents are remanded to the SHU (which is almost always fully occupied) so that prison staff can take advantage of seemingly vulnerable residents, and/or as a retaliation for an individual's complaints regarding the unconstitutional conditions at USP Lee and/or requests for medical— particularly mental health—care.

40.    When all of the cells in the SHU are full and prison staff want to transfer an individual in a particular unit to the SHU, the resident's particular unit is placed on "lockdown." When a unit is on lockdown, individuals in that unit do not receive hot meals, are not permitted to shower regularly, do not receive clean clothing, do not receive phone calls or visits from family, and cannot access the prison's programming or the law library.

41.     The almost-exclusively-white prison staff at USP Lee discriminates against residents of color by disproportionately targeting them for physical violence, other forms of abuse, depriving them of medical attention and other basic rights, and housing them in the SHU. Prison staff also regularly, consistently and openly use vulgar racial epithets to refer to Black and Hispanic residents.

42.     Prison staff, including Defendant Chad Hamilton, Defendant Bradburn, Defendant Dickenson, Defendant Ewing, Defendant Corbin, Defendant Gilmer, and other Unknown SHU Defendants ("SHU Defendants"), often force prisoners to "put in work" by fighting each other, targeting certain residents for violence.  SHU Defendants purposefully pair individuals who pose a safety threat to each other in the same cell—creating dissonance between them by sharing otherwise protected information about the individual's prior conviction or disseminating lies about the same based on prior disciplinary infractions.  SHU Defendants will alert one cellmate that the other is a child molester, referring to the offending resident as a "cho mo," and then demand that his non-offending cellmate beat the one labeled as a "cho mo."  USP staff, including the SHU Defendants, threaten to physically assault and abuse any cellmates who do not comply.  Because if they fight each other they can control the nature of the violence, most cellmates agree to fight rather than risk assault by the SHU Defendants.

43.     The culture of inhumane violence and abuse at USP Lee, experienced first-hand by Mr. Santiago, has been previously documented at length.  In a September 6, 2019 "Follow-Up Inspection Report,"[19] investigators at the District of Columbia Corrections Information Council

---

[19] *See generally* Charles Thronton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council (Sept. 6, 2019),
https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%20FINAL%20with%20BOP%20response%209-6-19.pdf.

(the "CIC")[20] reported a litany of unconstitutional and sub-standard practices, including the following:

- Many residents expressed the expectation that they would face some form of retaliation for their participation in CIC interviews, from physical assaults by staff, to loss of facility jobs, to having their mail held for an excessive period.[21]

- Individuals reported being left in four-point restraints for 12 to 13 hours and more than 16 hours without access to toilets.[22]

- Several individuals mentioned a regular practice in which residents were assaulted, restrained, put in a paper gown, and forced to walk backwards in view of other residents.[23]

- One resident was slammed to the ground by an officer and then tied to a chair and left in an office for an hour before being transported to the SHU.[24]

- Residents said that staff beat residents with apples in socks or through a shield to prevent leaving marks of the assault.

- Individuals reported sexual assault or sexual harassment by staff, including seeing an officer grab a resident's testicles.

- One resident reported that a lieutenant put a shield on the resident's chest, and kneeled on it while the resident was on his back and shackled.[25]

---

[20] The District of Columbia does not maintain its own prison system. Instead, individuals sentenced for felony offenses under the D.C. Code are transferred to the Federal Bureau of Prisons. The CIC is an independent oversight entity maintained by the U.S. Congress and the Council of the District of Columbia to inspect, monitor and report on conditions of confinement at all facilities, including federal facilities, where D.C. Code offenders are housed.
[21] *Id.* at 8, I.
[22] *Id.* at 8, II.
[23] *Id.*
[24] *Id.*
[25] *Id.*

13

- Prison staff regularly use racial slurs.[26]

- During cell shakedowns, officers routinely sweep residents' belongings into the trash, including clothes, food, and hygiene products purchased off commissary, and fail to provide documentation of the confiscation of their property.[27]

- The USP Lee staff undermine or outright foreclose residents from pursuing the Bureau of Prisons Grievance Process.  Residents have complained of being told by Warden Streeval that grievances would "never make it out of the SHU."[28] Other prison staff have told residents that their complaints will never go anywhere "because the Warden will lie for his staff."[29]

- Officers and USP Lee leadership have refused to separate cellmates who requested separation due to interpersonal conflict and the inherent safety risks caused by the conflicts, and have told residents to fight or stab each other.[30]

- Residents are not provided adequate medical care.[31]

- Residents have been forced to clean up raw sewage flooding into the cells without adequate protection.[32]

- USP Lee was on lockdown for most of 2018 because the SHU was operating at or near capacity.[33]

44.     As described further below, nothing has changed at USP Lee since the CIC report was issued.  The injuries sustained by Mr. Santiago in 2022 and the unconstitutional practices

---

[26] *Id.* at 8, IV.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.* at 11, V.
[32] *Id.* at 12, VI.
[33] *Id.* at 9, III.

14

that continue to be the norm at USP Lee are just the latest in a history of abuse that goes back many years.

## BOP Guidelines on Use of Force

45.    The injuries sustained by Mr. Santiago arose, in part, from practices that are expressly forbidden under the policies and regulations that govern staff conduct at USP Lee.

46.    The BOP strictly limits the use of force, including the placement of residents in restraints, as a last alternative after all other reasonable efforts to control a resident or situation have failed.[34]  When authorized, staff must use only that amount of force necessary to gain control of the resident, to protect and ensure the safety of residents, to prevent serious property damage, and to ensure institutional security and good order.[35]

47.    Prison staff may only use physical restraints if it is necessary to gain control of a resident who appears to be dangerous because the resident:  (a) assaults another individual; (b) destroys government property; (c) attempts suicide; (d) inflicts injury upon self; or (e) becomes violent or displays signs of imminent violence.[36]

48.    Under no circumstances may physical restraints be employed to punish residents.[37]

49.    BOP regulations further state that prison staff may temporarily apply physical restraints when one of the above requirements is met; however, the Warden or designee must decide whether the use of physical restraints should continue.[38]  If physical restraints are used, BOP policy mandates that the least restrictive restraint method be used that is necessary for the

---

[34] *Program Statement on Use of Force and Application of Restraints*, Federal Bureau of Prisons ¶ 5 (Nov. 30, 2005), https://www.bop.gov/policy/progstat/5566_006.pdf.
[35] *Id.* ¶ 6(c).
[36] *Id.* ¶ 1.
[37] *Id.* ¶ 6(h)(1).
[38] *Id.* ¶ 6(d).

situation.[39]  Specifically, "ambulatory restraints" (i.e., handcuffs, leg irons, and a belly chain) should initially be used if possible, and "four-point restraints" (i.e., chaining a resident to a bed at his wrists and ankles) should be used if they are the only means available to obtain and maintain control over a resident.[40]  The Warden is the only official at the prison who can decide whether and when "four-point restraints" should be used, and this duty cannot be delegated below the Warden's level.[41]

50.     When a resident is restrained for longer than eight hours, BOP regulations require that the Warden, the Warden's designee, or the institutional administrative duty officer must notify the BOP's Regional Director or Regional Duty Officer.[42]

51.     When a resident is chained using the "four-point restraint" method, a review of that resident's chaining in four-point restraints must be made by a lieutenant every two hours to determine if the restraints have had a calming effect so that the resident may be released from the restraints.[43]

52.     As soon as an officer determines the resident has regained physical control and is no longer a threat to himself, other residents, or property, his restraints must be removed.[44]  Staff members violate BOP policy if they keep residents restrained longer than necessary, or if they restrain residents to punish or discipline them.[45]

53.     Under BOP policy, all "use of force incidents must be reported and investigated . . . to eliminate the unwarranted use of force."[46]  In addition, prison staff must

---

[39] *Id.* ¶ 9.
[40] *Id.* ¶ 10.
[41] *Id.*
[42] *Id.* ¶ 10(g).
[43] *Id.* ¶ 10(e).
[44] *Id.* ¶ 5.
[45] *Id.* ¶ 6(b).
[46] *Id.* ¶ 6(j).

report the use of force directly to the Assistant Director, Correctional Programs Division; Assistant Director, Health Services Division; Central Office Correctional Services Administrator; Regional Director; and the Regional Correctional Administrator.[47]  These reporting protocols ensure that BOP management, from prison staff to the Warden to the Regional Director of the BOP, participates in the decision-making and monitoring process in the use of force, and that prison staff do not inappropriately use force on residents.

54.    As discussed further below, virtually none of these BOP regulations were complied with in using restraints on Mr. Santiago.

**Plaintiff Suffers from Severe Mental Health Issues and Receives No Treatment**

55.    Mr. Santiago has been diagnosed with a number of serious medical conditions, including major depression, anxiety, and bipolar disorder.  In the past, Mr. Santiago has taken psychotropic medications, specifically Celexa, to treat his mental health conditions.

56.    Mr. Santiago has also participated in several mental health treatment programs in the past, including a hospitalization at Lancaster Regional Medical Center in 2001.  Mr. Santiago has a history of depression, anxiety, along with suicidal feelings.  Since being incarcerated in the BOP, Mr. Santiago has had nine prior Suicide Risk Assessments ("SRA") completed and two suicide watch placements.

57.    Early on in his incarceration, Mr. Santiago was assigned a Mental Health Care Level of "1."  Mr. Santiago's Mental Health Care Level was elevated to a "2" from October 2010 to November 2015.  An elevated Mental Health Care Level requires prison officials to provide an increased level of care for individuals like Mr. Santiago.[48]  Nonetheless, Mr. Santiago currently

---

[47] *Id.* ¶ 14(a)(1)–(5).
[48] *See Care Level Classification for Medical and Mental Health Conditions or Disabilities*, Fed. Bureau of Prisons (May 2019), https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf.

is labeled as a Level "1."

58.    During Mr. Santiago's time at USP Lee, officers and staff neglected to generally care for or recognize Plaintiff's documented and pre-existing mental health conditions.  Indeed, Mr. Santiago did not receive any mental health medical care whatsoever during his time at USP Lee.

59.    Mr. Santiago requested that staff at USP Lee provide appropriate treatment for his documented mental health conditions.  Mr. Santiago's requests were met, time and time again, with indifference, neglect, threats, and, ultimately, physical abuse by USP Lee officials.

60.    Notwithstanding his requests, prior diagnoses and extensive documented history of mental health illnesses, staff at USP Lee instead diagnosed Mr. Santiago as exhibiting problematic behaviors that are judged to be of his personality rather than relating to underlying mental health problems, minimizing their obligation to afford him appropriate care and thereby deliberately interfering with Mr. Santiago's access to even minimal mental healthcare.

**Defendants' Torture of Mr. Santiago in Response to His Request for
Mental Health Treatment**

61.    On June 7, 2022, Mr. Santiago requested to meet with the USP Lee Psychologist, Defendant Phelps, to discuss his ongoing untreated stress and anxiety disorders.

62.    At the time of Mr. Santiago's request, the SHU was at full capacity, and Mr. Santiago's unit was on "lockdown."

63.    Instead of being escorted to meet with Defendant Phelps, Mr. Santiago was placed in handcuffs and temporarily held in the H-Unit's day room where the unit computers are located.

64.    Shortly thereafter, Defendants Welch and Wilson arrived at the day room, and ordered Mr. Santiago to bend over such that his body was positioned in an upside-down L-shape,

18

with his head being forced down to the height of his waist.  Mr. Santiago complied.  While in this position, Mr. Santiago was forced by Defendants Welch and Wilson to walk backwards out of the H-Unit, and through an isolated back corridor while Defendants Welch and Wilson forcefully pushed his head downwards and back to make sure his head remained at waist-level.

65.    Mr. Santiago was forced to walk in this position for approximately 150 feet while in the above-described painful and uncomfortable position.  Mr. Santiago asked if this mode of walking was necessary when he had only asked to meet with Defendant Phelps.  Defendant Wilson replied that he had been instructed to move Mr. Santiago in this manner.

66.    Mr. Santiago also suffers from heart disease and high blood pressure, two other serious medical conditions.  At one point during this walk, Mr. Santiago complained of dizziness to Defendants Welch and Wilson.  Defendant Wilson replied, "I'll have to jump on you if you fall, so keep going."

67.    Mr. Santiago was not taken to Defendant Phelps' office, but instead was escorted to a lieutenant's office—an office in which there are no cameras.  Once inside the lieutenant's office, Mr. Santiago was ordered to sit on a bench.  He did so.

68.    Defendant Phelps entered the lieutenant's office and asked Mr. Santiago what he wanted.  Mr. Santiago responded by first requesting a drink of water to alleviate his dizziness from the painful walk from his cell.  Defendant Phelps refused to give Plaintiff any water.

69.    Defendant Phelps then accused Mr. Santiago of requesting their meeting to request to be put on suicide watch.

70.    Mr. Santiago explained to Defendant Phelps that he was not requesting to be put on suicide watch, but instead was seeking care and assistance with his mental illnesses.  Defendant Phelps refused to listen to Mr. Santiago, stating "Your record shows that this is all you

19

do."  Defendant Phelps refused to conduct any mental health evaluation or session, and concluded "Well, we're done here!"  Mr. Santiago was not, at this time or any time prior to June 7, 2022, assaulting another individual; destroying property; attempting suicide; inflicting injury upon himself; or becoming violent or displaying signs of imminent violence—the BOP's self-imposed limitations for the use of restraints.[49]

71.    After Defendant Phelps exited the office, Defendant Vinzant grabbed Mr. Santiago by the shoulders.  After doing so, Defendant Vinzant then extended his leg out, causing Mr. Santiago to fall to the floor.  While on the floor, Mr. Santiago was immediately surrounded and pounced upon by Defendants Vinzant and Roberts, who, unprovoked, began punching and kicking Mr. Santiago.

72.    In the midst of the attack, Defendant Pauley, a registered nurse, entered the room and stated, "Mr. Santiago, I'm here to conduct an inmate injury assessment report.  Do you have any injuries?"  Mr. Santiago informed Defendant Pauley, who could clearly witness the ongoing attack, that he was being abused and injured.  Defendant Pauley replied, "No injuries," and exited the room.

73.    After Defendant Pauley exited the room, certain Unknown SHU Defendants stripped Mr. Santiago of all of his clothing, and placed him in thin paper, panty-like underwear that left his genitalia and buttocks exposed.  Certain Unknown SHU Defendants dressed Mr. Santiago in a gown made of similar paper-like materials.  Defendant Roberts then struck Mr. Santiago in the head.  Mr. Santiago was then strapped into a wheelchair while in restraints— he could not move.

74.    Soon thereafter, Mr. Santiago was relocated to another room in the SHU with a

---

[49] *Program Statement on Use of Force and Application of Restraints*, Federal Bureau of Prisons ¶ 1 (Nov. 30, 2005), https://www.bop.gov/policy/progstat/5566_006.pdf.

camera that appeared operable.  However, the lens of the camera was completely covered with toilet paper.  This room, known as the "Holding Cell," did not have any chairs or beds, but instead had a two-foot high concrete slab in its center.

75.    Defendant Chad Hamilton and Defendant Dickenson forced Mr. Santiago onto the concrete slab, and placed him in four-point restraints in the position shown in the right image below.[50]  A helmet was placed on Mr. Santiago.  In this position, Mr. Santiago's left arm and leg were shackled to the left side of the concrete slab and Mr. Santiago's right arm and leg were shackled to the right of the concrete slab.

76.    Defendant Chad Hamilton, the lieutenant on duty while Mr. Santiago was held in the four-point restraints, entered the Holding Cell and told Plaintiff, "I'm getting ready to videotape you.  If you fucking say anything on it other than that you have no injuries, I'm going to stop the camera, beat the fucking shit out of you, and then start again.  You understand?"

77.    Plaintiff remained in these four-point restraints for roughly 10–12 hours.  This was the first time in over twenty years of incarceration that Mr. Santiago had ever been placed in four-point restraints.

78.    While Mr. Santiago was in the four-point restraints, certain SHU Defendants, including Defendant Chad Hamilton, Defendant Gilmer, Defendant Bradburn and other Unknown SHU Defendants, would enter the room every 1–2 hours to slam Plaintiff's body with a shield and punch him in the testicles and other places throughout his body.  Defendant Dickenson aggressively scraped the shackles around Mr. Santiago's ankles creating bleeding open wounds.  Mr. Santiago also had a bruise on his forehead which was caused by Defendants' assault.  As a result of the Defendants' kicks to his abdomen, Mr. Santiago experienced

---

[50] The illustrations included herein were drawn by Mr. Santiago.

21

excruciating pain near his ribcage making it difficult for him to breathe.

79. Shortly thereafter, Defendants Hamilton and Pauley entered the room. Defendant Pauley again stated, "Mr. Santiago, I'm here to conduct an inmate-injury report. Do you have any injuries?" Mr. Santiago responded that he had no injuries, out of fear that he would be subjected to further torture if he reported his injuries.

80. After recording Mr. Santiago stating that he had no injuries, Defendant Chad Hamilton and Defendant Pauley returned to re-record Mr. Santiago's statement due to Defendant Hamilton's dissatisfaction with the first recording. Defendant Chad Hamilton demanded that Mr. Santiago open his mouth and show his teeth during the second recording. Defendant Chad Hamilton did not remove Plaintiff's helmet during the recording, ensuring that the bruise on Mr. Santiago's forehead was not visible to the camera. A thin casing was placed over the concrete slab, and the camera was positioned for this second recording so as to suggest that Mr. Santiago had been restrained on bedding instead of the concrete slab onto which he was shackled.

81. During the second recording, Defendant Pauley asked Mr. Santiago the same question: "Mr. Santiago, I'm here to conduct an inmate-injury report. Do you have any injuries?" Fearing further abuse, Mr. Santiago again stated that he had no injuries.

82. As soon as the second recording had concluded, certain Unknown SHU Defendants re-entered the Holding Cell, and while Mr. Santiago was still in the four-point restraints, rammed a shield into Plaintiff's body. Once again, Mr. Santiago had said or done nothing that would justify any use of force by the Defendants.

83. Defendant Dickenson and Defendant Chad Hamilton then re-positioned Mr. Santiago's restraints so that his left arm and left leg were shackled to the right side of the

22

concrete slab, and his right arm and right leg were shackled to the left of the concrete slab, as shown in the left image below.



84.    Roughly thirty minutes later, certain Unknown SHU Defendants returned to the Holding Cell, and re-positioned Mr. Santiago's restraints so that his left arm and leg were shackled to the left side of the concrete slab, and his right arm and leg were shackled to the right side of the concrete slab.  During each re-positioning, Defendant Dickenson and Defendant Chad Hamilton aggressively and deliberately grated the shackles against Mr. Santiago's wrists and ankles causing further injury.

85.    Subsequently, the Unknown SHU Defendants entered the Holding Cell approximately every two hours to subject Mr. Santiago to further abuse, each time administering additional punches to his abdomen, torso, and groin while Mr. Santiago remained in restraints. Defendant Bradburn slammed a large heavy shield repeatedly into Plaintiff's body, at one point jabbing the shield into Mr. Santiago's abdomen causing further injury to his rib cage.

23

86.     When Defendant Chad Hamilton noticed blood, he berated Mr. Santiago by shouting, "Did you get some fucking blood on my shield!"

87.     This cycle of torture went on for nearly 18 hours, and continued across shift changes whereby new prison staff took over for others whose workday had ended.  Defendant Corbin, the lieutenant on duty after Defendant Chad Hamilton's shift ended, led the continued torture of Mr. Santiago for several more hours until his shift ended.  Included in this round of torture on Defendant Corbin's shift was Defendant Ewing.

88.     During this entire period, Mr. Santiago never fought back or threatened to harm himself or any of the Defendants.

89.     Mr. Santiago was denied food and water throughout his 18-hour period in restraints.

90.     During this abuse, the Medical Defendants never conducted a meaningful medical assessment of Mr. Santiago's injuries or treated his injuries.

91.     During his torture, Mr. Santiago felt as if he would imminently pass out and was nearing death.  Defendant Corbin could see that Mr. Santiago was nearing his physical breaking point, but instead of relenting in his abuse, Defendant Corbin threatened Mr. Santiago with more torture if he did not agree to stop reporting prison staff for their abuse and wrongdoings.

92.     During these beatings of Mr. Santiago, Defendant Corbin remarked to the other Defendants, "This fucking guy wrote just about every officer in USP Lee up!"

93.     Mr. Santiago agreed to stop filing grievances and reporting the abuse at USP Lee out of fear that he would die that day if he did not do so.  But Mr. Santiago told Defendant Corbin that he would continue advocating for himself in his underlying criminal case, to which Defendant Corbin replied, "I don't give a fuck about your criminal case, but you're going to stop

24

with the lawsuits.  And you're going to give up the Tort Claim, right?"  At the time of this

encounter, Mr. Santiago had a pending tort claim in the U.S. District Court for the Western

District of Virginia.  *See Santiago v. United States of America*, No. 7:21-cv-00436 (W.D. Va.

terminated Mar. 14, 2021).

94.     Despite Mr. Santiago's statement that he would forego his tort claims and other

grievances, and notwithstanding Mr. Santiago's pleas for mercy, Defendant Corbin had no plans of



ceasing the torture, stating to Mr. Santiago, "You're still going to be in here for quite some time."

95.     During next few subsequent visits into the Holding Cell, Defendant Corbin did

not physically assault Mr. Santiago.

96.     However, a few hours later, Defendant Corbin returned to the Holding Cell,

removed the four-point restraints, and placed Mr. Santiago in ambulatory restraints.  While in

25

ambulatory restraints, Mr. Santiago's hands were tightly bound in the front of his body while his ankles remained shackled, as depicted in the image above.

97.     The torture continued while Mr. Santiago remained in ambulatory restraints, with certain of the Unknown SHU Defendants entering the Holding Cell and ordering Mr. Santiago to kneel down as close to a wall as possible while Defendant Ewing pressed a shield into the back of Mr. Santiago's knees and smashed and ground Mr. Santiago's feet and toes with his military boots.



98.     While this was happening, Defendant Corbin taunted Mr. Santiago, yelling, "My men are real tough guys.  If I order them—to fuck you up, you'll be laid out on the ground in real pain.  We're taking it light on you."  Defendant Corbin further remarked, "You owe my men an apology, since you're making them do extra work," forcing Mr. Santiago to apologize orally while he was in agonizing pain.

26

99.     Defendant Corbin entered the Holding Cell to record Mr. Santiago on an unknown recording device, and asked "Mr. Santiago, are you scared?"  Mr. Santiago responded, "I'm terrified!"

**Defendants' Deliberate Indifference to Plaintiff's Serious Medical Needs Caused Serious Injury**

*Defendants' Denial of Medical Care for Injuries Resulting from June 7, 2022 Assault*

100.     As a result of the torture and excessive use of force perpetrated by the SHU Defendants, Mr. Santiago suffered ongoing and severe injuries to his head, wrists, chest, ribs, and ankles and feet.

101.     Despite being present and witnessing the other SHU Defendants' extreme abuse of Mr. Santiago on June 7, 2022, and despite Mr. Santiago's injuries, Defendant Pauley falsified an inmate injury assessment and indicated that, Mr. Santiago was not in any apparent distress and denied he had any injuries.

102.     On several subsequent occasions, Mr. Santiago requested a medical examination from Defendants Pauley and Bray, but was ignored.  Defendants Pauley and Bray refused Mr. Santiago's requests for medical examination and x-rays.

103.     As a result of Defendant Pauley's inadequate examination and inaccurate reports of Plaintiff's injuries, and subsequent denial of his medical care, Mr. Santiago continued to suffer severe pain to the left side of his chest and back.  Mr. Santiago submitted sick call slips on June 12, June 14, and June 30, all while he was still in the SHU, and each of which requested an x-ray.  He was never examined.

104.     Seven weeks later, on July 28, 2022, when Mr. Santiago was released from the SHU, he again sought medical treatment, and requested an x-ray in light of his ongoing pain.

105.     Over 30 days later, on August 31, 2022, an x-ray confirmed that, in addition to

27

multiple lacerations, bruises, and contusions, Mr. Santiago also had suffered a fractured rib when he was beaten by the SHU Defendants on June 7, 2022.  In failing to conduct any real assessment of Mr. Santiago's injuries, which would have included an x-ray, Mr. Santiago suffered excruciating pain with each breath—caused by his fractured rib—for the several weeks following his attack.  He was not offered any sort of remedy to manage his pain related to this injury.

106.    Furthermore, in conjunction with the physical injuries he had suffered on June 7, 2022, Mr. Santiago suffered emotional distress, increased anxiety, excessive tremors, increased paranoia, trouble sleeping, and an increased heart rate.

*Defendants' Denial of Mental Health Care*

107.    Mr. Santiago's medical records detail his significant history of mental illness, including major depression, anxiety, bipolar disorder, and several attempts of suicide.  These conditions pre-dated Mr. Santiago's time at USP Lee, and Mr. Santiago had received medical attention for his mental health conditions at other BOP institutions.

108.    Living conditions at USP Lee, including lengthy durations of locked-down units and extensive stays in the SHU (as experienced by Mr. Santiago), as well as the extraordinary physical abuse suffered by Mr. Santiago, and others, created a damaging environment that exacerbated Mr. Santiago's pre-existing conditions of depression and anxiety.

109.    Defendant Phelps denied Mr. Santiago's request for a mental health examination and treatment in the moments that immediately had preceded Mr. Santiago's June 7, 2022 abuse by the SHU Defendants.

110.    As a result of this denial of mental health care, Mr. Santiago suffered from increased feelings of fear and worry, heightening his symptoms of major depression and anxiety.

111.    Mr. Santiago continues to suffer from severe mental and emotional distress as a direct result of the traumatic events he endured at USP Lee which have further exacerbated the

28

symptoms of his pre-existing mental health conditions. Indeed, Mr. Santiago remains so severely traumatized by Defendant Phelps's, Defendant Bray's, and Defendant Pauley's deliberate indifference to his health and safety that he has since avoided seeking medical treatment at USP Victorville, the BOP facility where he is now housed.

## USP Lee's Systemic Abuse Is Concealed by Its Administration

*Defendants Have a Pattern and Practice of Violating Plaintiff's Constitutional Rights Which Impact Plaintiff's Access to Legal Counsel and Administrative Remedies*

112.    As a pattern and practice at USP Lee, despite correspondence being designated as "Special" mail that should "only be opened in the presence of inmate," Defendants have repeatedly opened and read Mr. Santiago's legal mail in violation of his constitutional right to privileged and confidential communications with his legal counsel.

113.    Upon information and belief, USP Lee staff, who were present in the mailroom at the times Mr. Santiago delivered his mail to the mailroom for transmittal, as well as other Unknown SHU Defendants, prevented Mr. Santiago's mail from leaving the facility, including correspondence that chronicles abusive practices at USP Lee, thereby preventing Mr. Santiago from communicating with his attorneys or prison administration officials regarding his complaints of abuse occurring at USP Lee.

114.    Defendants repeatedly falsified disciplinary incident reports and medical reports concerning Mr. Santiago. On one occasion in 2022, after entering Mr. Santiago's cell and confiscating and destroying his property, including certain of his legal documents, Defendant Hall filed a false 300-series incident report against Mr. Santiago for possessing an unauthorized heating device. At no time during his stay at USP Lee did Mr. Santiago own or possess a heating device. Upon information and belief, Defendant Hall planted a heating device in Mr. Santiago's cell to justify his report, which was submitted in retaliation for Mr. Santiago pursuing grievances.

29

115.    In December 2021, in response to Mr. Santiago's request to have the restrictions lifted on his TRULINCS account and, at minimum, to restore his access to the electronic law library, Defendant Dye falsely reported in a grievance response that Plaintiff had access to the law library.

116.    Following the June 7, 2022 incident and abuse against Mr. Santiago by the SHU Defendants, Defendant Pauley filed a false medical report, stating that "Plaintiff denied injuries," even though this is contrary to Mr. Santiago's claims of injury and severe pain and despite having witnessed Mr. Santiago's abuse.

117.    On several occasions, between June 7 and August 15, 2022, Mr. Santiago's attempts to file grievances related to his physical abuse and the injuries he suffered were thwarted by the SHU Defendants who refused to provide Mr. Santiago with grievance forms, destroyed Mr. Santiago's grievance forms, or mysteriously "lost track" of Mr. Santiago's completed grievance forms.

118.    USP Lee staff have a pattern and practice of entering Mr. Santiago's and other residents' cells and removing legal papers and personal property.  On more than one occasion, Defendants have entered Mr. Santiago's cell and destroyed his personal property, including drafts of his legal complaints, letters to his attorney, and other legal documents.

119.    The removal of Mr. Santiago's documents impaired his ability to communicate with his attorney in his underlying criminal case and to pursue administrative remedies against the Defendants in a timely manner.

## CAUSES OF ACTION

### COUNT ONE

*Violation of Plaintiff's Eighth Amendment Rights (Against Defendants Garland, Peters, Gomez and Streeval in their official capacities)*

120.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

121.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment."

122.    Defendants engaged and continue to engage in a pattern, practice or policy of failing to intervene to protect Mr. Santiago and other residents from known and repeated intentional and unjustified acts of violence at the hands of Defendants Vinzant, Chad Hamilton, Ewing, Dickenson, Bradburn, Roberts, Gilmer, and Unknown SHU Defendants, and the deliberate indifference of Defendants Phelps, Bray and Pauley to serious medical needs.  In so doing, they deprived Mr. Santiago and others of their constitutional right to be free from cruel and unusual punishment.  This violence and indifference will continue unless the BOP's patterns, practices, culture and policies are changed.  If appropriate declaratory and injunctive relief is not granted, the harms suffered will be irreparable, may lead to death, and will continue for the foreseeable future.

123.    Defendants' acts and omissions have caused serious injury to Mr. Santiago. Although Mr. Santiago is no longer housed at USP Lee, his custody level remains high-security, which means that he could be returned to USP Lee at any time.  Therefore, he is entitled to injunctive relief.

<u>COUNT TWO</u>

*Violation of Plaintiff's Eighth Amendment Rights (Against Defendant Vinzant, Defendant Chad Hamilton, Defendant Ewing, Defendant Dickenson, Defendant Bradburn, Defendant Roberts, Defendant Gilmer, and Unknown SHU Defendants)*

124. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

125. The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment."

126. As outlined above, on June 7, 2022, Mr. Santiago was brutally beaten, without justification and for the very purpose of causing harm, by Defendant Vinzant, Defendant Chad Hamilton, Defendant Ewing, Defendant Dickenson, Defendant Bradburn, Defendant Roberts, Defendant Gilmer, and Unknown SHU Defendants while being held in various forms of restraints, in violation of explicit BOP policies and the Eighth Amendment.

127. Mr. Santiago sustained severe physical injuries, including multiple bruises, lacerations, contusions, and a broken rib, as well as mental anguish, as a result of the SHU Defendants' assault on June 7, 2022.

128. As a direct, foreseeable, and proximate result of the SHU Defendants' deliberate indifferences to Mr. Santiago's health and safety in violation of his Eighth Amendment rights on June 7, 2022, Mr. Santiago has suffered damages, including, without limitation, incidental, actual, consequential, and compensatory damages. Additionally, as a result of the SHU Defendants' egregious, intentional, and reckless conduct in conscious disregard for Mr. Santiago's safety, as well as their pattern and practice of repeatedly violating Mr. Santiago's Eighth Amendment rights, Mr. Santiago is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

## COUNT THREE

*Violation of Plaintiff's Eighth Amendment Rights (Against Defendant Streeval, Defendant Bowles Defendant Corbin, Defendant Calton, Defendant Will Hamilton, Defendant Welch, Defendant Wilson, Defendant Phelps, Defendant Bray, Defendant Pauley, and Doe Defendants 1-5)*

129.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

130.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment." This includes the right to be protected from known and substantial risks of serious harm.

131.    As outlined above, on June 7, 2022, Mr. Santiago was brutally beaten, without justification, by Defendant Vinzant, Defendant Chad Hamilton, Defendant Ewing, Defendant Dickenson, Defendant Bradburn, Defendant Roberts, Defendant Gilmer, and Unknown SHU Defendants while being held in various forms of restraints, in violation of explicit BOP policies and the Eighth Amendment.

132.    Defendant Corbin, Defendant Streeval, Defendant Bowles, Defendant Corbin, Defendant Calton, Defendant Will Hamilton, Defendant Welch, Defendant Wilson, and Unknown SHU Defendants did not actively participate in Mr. Santiago's abuse on June 7, 2022, but also violated Mr. Santiago's Eight Amendment rights by disregarding and failing to protect him from the risk of known, unnecessary, and gratuitous force, deliberately indifferent to Mr. Santiago's health and safety.

133.    Mr. Santiago sustained severe physical injuries, including multiple bruises, lacerations, contusions, and a broken rib, as well as mental anguish, as a result of the SHU Defendants' assault and the acquiescence of Defendant Streeval, Defendant Bowles Defendant Corbin, Defendant Calton, Defendant Will Hamilton, Defendant Welch, Defendant Wilson, Defendant Phelps, Defendant Bray, Defendant Pauley, and Doe Defendants 1–5 on June 7, 2022.

134.    As a direct, foreseeable, and proximate result of the SHU Defendants' deliberate indifference to Mr. Santiago's health and safety, in violation of his Eighth Amendment rights on June 7, 2022, Mr. Santiago has suffered damages, including, without limitation, incidental, actual, consequential, and compensatory damages.  Additionally, as a result of the SHU Defendants' egregious, intentional, and reckless conduct in deliberate indifference to Mr. Santiago's safety, as well as their pattern and practice of repeatedly violating Mr. Santiago's Eighth Amendment rights, Mr. Santiago is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

<u>COUNT FOUR</u>

*Violation of Plaintiff's Eighth Amendment Rights (Against Defendant Streeval, Defendant Phelps, Defendant Bray, and Defendant Pauley)*

135.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

136.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment."  This right includes the right of residents in federal prison to receive adequate medical care.

137.    As outlined above, on June 7, 2022, Mr. Santiago was brutally beaten by certain of the SHU Defendants while being held in various forms of restraints, in violation of explicit BOP policies and the Eighth Amendment.  When he sought medical assistance for his injuries sustained in this assault, he was ignored.  Worse, the Medical Defendants, in coordination with other Defendants, collaborated in making a false record to conceal his abuse and resulting injuries and to withhold medical treatment for severe injuries that included a broken bone and head trauma.

138.    Mr. Santiago sustained extensive physical and mental injuries as a result of the

34

SHU Defendants' assault on June 7, 2022.  Despite Mr. Santiago's repeated requests, the Medical

Defendants failed to provide any medical care whatsoever for these injuries, leaving

Mr. Santiago in excruciating physical and psychological pain for a period of several weeks.

139.    As a direct, foreseeable, and proximate result of the Medical Defendants'

deliberate indifference to Mr. Santiago's serious medical needs, Mr. Santiago has suffered

unnecessary and wanton infliction of pain in violation of the Eighth Amendment.  And as a

result, he is entitled to damages, including, without limitation, incidental, actual, consequential,

and compensatory damages.  Additionally, as a result of the Medical Defendants' egregious,

intentional, and reckless conduct in conscious disregard for Mr. Santiago's safety, as well as their

pattern and practice of repeatedly violating Mr. Santiago's Eighth Amendment rights,

Mr. Santiago is entitled to punitive damages, as well as such other appropriate damages and

relief permitted by law, all in an amount to be determined at trial.

## COUNT FIVE

*Violation of Plaintiff's Eighth Amendment Rights (Against Defendant Streeval, Defendant Phelps,
Defendant Bray, and Defendant Pauley)*

140.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as

though fully set forth herein.

141.    The Eighth Amendment to the United States Constitution prohibits "cruel and

unusual punishment."  This right includes the right of residents in federal prison to receive

adequate medical care.

142.    As outlined above, on June 7, 2022, Mr. Santiago sought medical assistance at

USP Lee for his diagnosed mental illnesses, and was not only ignored, but also beaten in

response to his request.  Worse, the Medical Defendants, in concert with other Defendants,

collaborated in making a record to obscure his mental illnesses and to withhold medical

treatment for substantial and documented medical ailments.  Indeed, the Medical Defendants failed to provide any medical care whatsoever for Mr. Santiago's mental health conditions, leaving Mr. Santiago to suffer extreme psychological pain.

143.    As a direct, foreseeable, and proximate result of the Medical Defendants' deliberate indifference to Mr. Santiago's serious medical need, Mr. Santiago has suffered unnecessary and wanton infliction of pain, in violation of the Eighth Amendment.  As a result, he has sustained damages, including, without limitation, incidental, actual, consequential, and compensatory damages.  Additionally, as a result of the Medical Defendants' egregious, intentional, and reckless conduct in conscious disregard for Mr. Santiago's safety, as well as their pattern and practice of repeatedly violating Mr. Santiago's Eighth Amendment rights, Mr. Santiago is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

## RELIEF SOUGHT

A.      Plaintiff seeks to be fully and fairly compensated for his injuries, pain, suffering, emotional, and mental distress to the fullest extent permitted under federal law.

B.      Plaintiff requests Declaratory and Injunctive Relief as set forth in Count One.

C.      Plaintiff requests $10,000,000 in compensatory damages from Defendants.

D.      Plaintiff requests $5,000,000 in punitive damages from Defendants.

E.      Plaintiff requests pre-judgment interest and post-judgment interest, together with an award of fees incurred in this case (including attorneys' fees), expenses, disbursements, and costs arising from this action; and

F.      Plaintiff requests any and all other relief this Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury on all counts so triable.

36

Dated:   October 13, 2023

                                                   Respectfully Submitted,

                                                   */s/ Kristin L. McGough*

Kristin L. McGough
WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS & URBAN AFFAIRS
700 14th Street, N.W., Ste. 400
Washington, DC 20005
Tel: (202) 319-1067
kristin_mcgough@washlaw.org

                                                   */s/ W. Hunter Winstead*

W. Hunter Winstead (Virginia Bar
Number: 66770)
Lelia F. Parker
December L. Huddleston
William H. Swain
GILBERT LLP
700 Pennsylvania Avenue, SE
Washington, DC 20003
Telephone:  (202) 772-2344
Facsimile:   (202) 772-3333
hwinstead@gilbertlegal.com
parkerl@gilbertlegal.com
huddlestond@gilbertlegal.com
swainw@gilbertlegal.com

*Attorneys for Plaintiff Marcos F. Santiago*

37

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of October 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which provided electronic service to all counsel of record.

*/s/ Lelia F. Parker*
Lelia F. Parker